No. 84-199

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

---

STATE OF MONTANA,

        Plaintiff and Respondent,

  -vs-

RONALD ALLEN SMITH,

        Defendant and Appellant.

---

APPEAL FROM:  District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable Michael Keedy, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Gary G. Doran argued, Kalispell, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
Chris Tweeten argued, Asst. Atty. General, Helena
Ted O. Lympus, County Attorney, Kalispell, Montana

---

Submitted:    January 21, 1985

Decided:    April 9, 1985

Filed: APR 9 1985

*Ethel M. Harrison*

---
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This appeal presents questions regarding the administration of Montana's capital sentencing statute. The defendant, Ronald Allen Smith, was convicted of the following offenses, to wit: Count I: Aggravated Kidnapping; Count II: Deliberate Homicide; Count III: Aggravated Kidnapping; Count IV: Deliberate Homicide. The defendant was convicted of each count pursuant to pleas of guilty entered in the District Court of Flathead County, State of Montana.

On August 4, 1982, defendant kidnapped and killed Harvey Mad Man, Jr., and Thomas Running Rabbit, Jr., at a remote location near U.S. Highway 2, west of the eastern border of Flathead County. On August 3, 1982, the defendant and two companions, Andre Fontaine and Rodney Munro, had departed from Alberta, Canada. The three encountered the two victims, Mad Man and Running Rabbit, at a bar in East Glacier, Montana. While at the bar, the three shot pool and drank beer with Mad Man and Running Rabbit. The three left the bar in East Glacier and hitchhiked west along Highway 2. There had been discussion between the defendant and Andre Fontaine about stealing a car and the need to eliminate any witnesses to the theft. Shortly thereafter, the three men were picked up by Mad Man and Running Rabbit. The men drove for approximately twenty minutes and stopped to allow Mad Man and Running Rabbit to relieve themselves. When the two men got back into the car, the defendant pulled a sawed-off single-shot bolt action .22 rifle, brought illegally into this country, and pointed it at the driver. Munro displayed his knife to the passenger. The defendant and Munro marched the two victims into the trees. The defendant shot Harvey Mad Man in the back of the head at point-blank range. He

2

reloaded the rifle, walked several feet to where Thomas Running Rabbit had fallen to the ground upon being stabbed by Munro, and shot him in the temple at point-blank range. Both men were killed instantly. The defendant and the other two then stole the victims' car and proceeded to California. The car was later recovered when Fontaine and Munro were arrested for armed robbery in California. The defendant was arrested in Wyoming.

An information was filed charging defendant with two counts of aggravated kidnapping and two counts of deliberate homicide. An arraignment hearing was held on November 1, 1982, at which time the defendant entered a plea of "not guilty" to all charges. On February 24, 1983, the defendant entered a change of plea. The defendant admitted shooting both victims in the head. The court was apprised of the defendant's intention to seek the death penalty.

At the sentencing hearing on March 21, 1983, the court and parties reviewed the presentence report and, after one minor correction, the court admitted it without objection. At the hearing, the defendant testified that he had been in prison for eight of the last ten years, and that he had lived by petty theft and selling drugs when he was not in prison. He testified in detail about the sixteen prior offenses listed in the presentence report. He testified to the facts of the killing. He stated that Munro was aware of his intent to kill the victims and was unwilling to kill. He stated that he killed the victims because he intended to steal their car and wished to leave no witnesses. He stated that in addition to his desire to eliminate the witnesses to the car theft, he had had a "morbid fascination to find out what it would be like to kill somebody." He testified that he had consumed two or three beers on the night of the crime but

3

that his ability to understand his actions were not impaired. He testified he sought the death penalty because a prolonged period of incarceration would be of no benefit to himself or society and because he foresaw problems with the Indian population at the prison. He testified that he felt no remorse for the killings, that he considered himself a violent person, and that he felt he could kill again. He stated that he had no desire to change his lifestyle. Following extensive questioning by the court, the defendant denied being under the influence of drugs, intoxicants or extreme stress and stated that he knew of no mitigating circumstances.

On March 21, 1983 at the conclusion of the hearing to determine the existence and nature of any aggravating or mitigating circumstances, the court imposed a sentence of death upon the defendant.

Subsequently, the defendant filed a motion to seek a reconsideration of the death penalty and a motion for a psychiatric examination. The court held a hearing on the motions on May 3, 1983. At the hearing, the defendant testified that his family had induced him to change his mind and seek a lesser penalty than death. He testified that his earlier desire for the death penalty was the product of depression which had resulted from the long period of solitary confinement in the Flathead County Jail following his arrest. He further testified that he had designed his earlier testimony to induce the court to sentence him to death, and that he had concealed a potential mitigating factor--his use of drugs and alcohol. He testified that he and Munro had used three or four hundred "hits" of LSD during the period of time immediately prior to their entry to the United States, ending the day before the murders. He further

4

testified that on the day of the crime he had consumed approximately twelve beers.

On June 10, 1983, the court granted the defendant's motion for psychiatric evaluation. The court appointed a psychiatrist, Dr. William Stratford, to examine the defendant and report to the court as to: (1) whether he could determine which of the versions given by the defendant was credible; and (2) what was the defendant's mental condition on August 4, 1982. The defendant requested the court to amend its order deleting the investigative function of Dr. Stratford. The court amended its order and directed Dr. Stratford to assume the truth of defendant's second version of the facts in performing his examination.

The court held a hearing on defendant's motion for reconsideration of the sentence on December 1, 1983. At the hearing, Dr. Stratford testified that he found no evidence that the use of drugs or alcohol affected the defendant's capacity to appreciate the criminality of his conduct, conform his conduct to the requirements of law, or form a criminal intent. He based his conclusions on the defendant's testimony and statements regarding his extensive use of LSD and his conduct on the day of the crime. According to Dr. Stratford, after three or four consecutive days of heavy LSD usage the user develops a tolerance for the drug. As a result, large doses have little or no affect. Given the defendant's history of heavy LSD usage for a period of one month or more prior to the crime, Dr. Stratford concluded that the use of eight or nine, or even as many as fifty doses of LSD would not have affected the defendant's mental state when he committed the homicides.

Rodney Munro, the defendant's accomplice, also testified at the hearing. Munro stated that at the time of the

crime, he was experiencing confusion, flashes of light and hallucinations, having ingested approximately the same amount of drugs and alcohol as the defendant. He also testified that he had stabbed Running Rabbit once before the defendant shot him, and that it was possible Running Rabbit was already dead before he was shot.

On December 12, 1983, the defendant filed his motion for an additional psychiatric evaluation. The defendant's motion was denied.

In reviewing defendant's motion for reconsideration, the court entered findings of fact and conclusions of law to support its original sentence. The court found that beyond a reasonable doubt the aggravated kidnappings committed by the defendant resulted in the death of his victims, satisfying the statutory aggravating circumstance stated in section 46-18-303, MCA. The court found beyond a reasonable doubt that no mitigating circumstances were present. The court found that without exception, the defendant's consumption of alcohol and drugs was voluntary, and did not impair or otherwise affect his state of mind, his capacity to recognize and appreciate the criminality of his conduct or his ability to control his actions and to conform his conduct to the requirements of law. The court concluded that the defendant made a conscious and voluntary choice to kill the victims notwithstanding his use of drugs and alcohol, and that intoxication was not a sufficient mitigating circumstance to call for leniency. The court affirmed its previously imposed death sentence.

Defendant appeals from this sentence imposed and presents thirteen issues on appeal:

1. Whether the sentencing court may consider prior Canadian convictions, obtained without the right to counsel, in imposing sentence.

2. Whether the inclusion of juvenile offenses as adult offenses in the presentence report constituted error.

3. Whether the court's order that defendant submit to a presentence interview prior to sentencing violated his Fifth Amendment rights.

4. Whether the use of a presentence report containing a recommendation for the death penalty was improper and violative of the defendant's rights.

5. Whether the sentencing judge erred in the evaluation of mitigating factors by overlooking:

    (a)   letters of recommendation;

    (b)   tests regarding depersonalization;

    (c)   evidence of drug use; and

    (d)   questions as to whether Running Rabbit may have died as a result of stab wounds.

6. Whether the statutory mitigating circumstances requiring "extreme mental or emotional disturbance" and "substantial impairment" unconstitutionally limit the court's consideration of mitigating circumstances.

7. Whether the District Court erred in denying defendant's motion for additional psychiatric evaluation.

8. Whether the District Court violated defendant's rights by issuing its final order in writing rather than in defendant's presence in open court.

9. Whether the admission and consideration of aggravating factors other than those established by section 46-18-303, MCA, violates the Eighth Amendment.

7

10. Whether the Montana capital sentencing procedure is unconstitutional because it provides no jury participation in the sentencing process.

11. Whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor.

12. Whether evidence supports the District Court's findings of aggravating and mitigating circumstances.

13. Whether the sentence of death is excessive or disproportionate to the penalty in similar cases.

We address the first issue raised by defendant that it was error for the District Court to consider the defendant's uncounseled Canadian convictions in imposing the sentence. The presentence report noted that the defendant had committed four juvenile and ten adult offenses. The District Court noted that five of the ten convictions identified in the presentence report were obtained in proceedings without the benefit of representation by counsel. The defendant relies upon a Michigan Court of Appeals decision, People v. Braithwaite (Mich. 1976), 240 N.W.2d 293, where the defendant had been convicted of a crime in Canada which was included in the presentence report. The court found the foreign conviction inadmissible. The court concluded that since many foreign jurisdictions do not provide due process rights equivalent to those existing in the United States, it would be manifestly unfair to allow foreign convictions to be considered in sentencing a defendant convicted of a crime in this country. However, in People v. Wallach (Mich. 1981), 312 N.W.2d 387, the same court criticized the Braithwaite panel's absolute prohibition of the use of foreign convictions and held that a foreign conviction could be used for impeachment purposes if the foreign country provided

8

criminal defendants with sufficient due process safeguards. The defendant further claims that in People v. Gaines (Mich. 1983), 341 N.W.2d 519, the Michigan Court of Appeals placed the burden of proof concerning the foreign country's criminal justice system on the prosecution, and similarly, the burden should be on the State in the present matter.

The State submits that the burden of persuasion should rest with the defendant. We agree. In Montana, the defendant bears the burden of challenging matters contained in the presentence report. State v. Transgrud (Mont. 1983), 651 P.2d 37, 39 St.Rep. 1765; State v. Radi (1979), 185 Mont. 38, 604 P.2d 318. Moreover, several Federal Courts of Appeals have held that foreign convictions may be considered by a sentencing court unless the defendant demonstrates that they were obtained under a system which provided inadequate procedural safeguards. See United States v. Manafzadeh (2nd.Cir. 1979), 592 F.2d 81; United States v. Wilson (4th Cir. 1977), 556 F.2d 1177, cert. denied, 434 U.S. 986, (1977).

The defendant argues the Canadian conviction cannot withstand the scrutiny of the Sixth Amendment of the United States Constitution providing for the right to counsel. Within this context, the defendant argues the holding in Ryan v. Crist (1977), 172 Mont. 411, 563 P.2d 1145, applies to the case at bar. In Ryan, the Montana Supreme Court stated that the sentencing court cannot rely upon a previous criminal record if that record contains constitutionally infirm convictions.

The Ninth Circuit Court of Appeals has rejected this argument on similar facts. In United States v. Fleishman (9th Cir. 1981), 684 F.2d 1329, cert. denied 459 U.S. 1044 (1982), the defendant asserted that he was improperly

sentenced due to the district court's expressed consideration of their prior, uncounseled Mexican convictions for drug-related offenses. The circuit court affirmed the sentence because the record showed that the sentencing judge was aware that the convictions were uncounseled. A direct analogy between the present case and Fleishman exists. In the instant matter, the District Court was under no mistaken belief that the prior Canadian convictions were uncounseled. The District Court was apprised of the alleged infirmities attending the Canadian convictions. Furthermore, we find no violation of State v. Olsen (Mont. 1980), 614 P.2d 1061, 37 St.Rep. 1313, which mandates a defendant is entitled to a conviction based on substantially correct information. The record clearly reflects that the District Court was aware of the uncounseled prior convictions. The defendant's own admission to the commission of the crimes and the prior counseled Canadian convictions also formed a part of the record. We simply fail to find any indication of erroneous information in the record. We therefore hold the consideration of defendant's prior uncounseled Canadian convictions is no basis for resentencing.

The defendant next claims error in the sentence because the presentence report included four offenses in the adult category committed prior to the defendant attaining the age of majority. The defendant contends the inclusion of juvenile offenses under the adult category prejudiced him because the offenses were considered criminal convictions. The defendant argues that he is entitled to have his sentence predicated on substantially correct information. Townsend v. Burke (1948), 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690; State v. Knapp (1977), 174 Mont. 373, 570 P.2d 1138.

The following testimony reveals that the defendant had the opportunity to review the presentence report prior to sentencing:

"THE COURT: In preparation for this hearing and at my request, Jerry Cooley, District Probation and Parole Officer, has conducted a presentence investigation and prepared a report about you, Mr. Smith, including his recommendations to me regarding sentencing. Are you aware of that?

"THE DEFENDANT: Yes.

"THE COURT: Have you had an opportunity to review his report?

"THE DEFENDANT: Yes, I have.

"THE COURT: Have you discussed it with your attorney, Mr. Doran?

"THE DEFENDANT: Yes.

"THE COURT: Do you have any additions or corrections to make to the report?

"MR. DORAN: Your Honor, I would respond to that. In reviewing the presentence report with the defendant, it appears that on page 2 of the presentence report on the fourth offense indicated entitled 'Parole Violation, Red Deer, Alberta,' indicates a date of 6-18-81 and that date should appropriately be 11-26-81.

"MR. LYMPUS: Your Honor, the State has no objection to the report being amended to so indicate that change and would move the court that it be so done.

"THE COURT: Thank you Mr. Lympus, and thank you Mr. Doran. Are there any other additions or corrections to be made on behalf of the defendant to this report?

"MR. DORAN: The defendant has indicated no further additions or corrections.

"THE COURT: Mr. Smith, is the report as amended entirely accurate?

"THE DEFENDANT: Yes.

"THE COURT: Do you agree with that Mr. Doran?

"MR. DORAN: I believe it is so."

11

The foregoing colloquy clearly demonstrates the District Court afforded the defendant the opportunity to refute or contradict the matters alleged in the report. Both the defendant and his counsel were presented with a copy of the report prior to the hearing. Both the defendant and his counsel were questioned extensively by the court regarding the accuracy of the report. For the first time the defendant suggests error in the sentence because the presentence report included four offenses committed prior to the defendant attaining the age of majority. This contention loses much of its credibility because the defendant waited until this appeal to raise it. This Court will not review a matter raised for the first time on appeal. Peters v. Newkirk (Mont. 1981), 633 P.2d 1210, 38 St.Rep. 1526; Northern Plains v. Board of Natural Resources (1979), 181 Mont. 500, 594 P.2d 297. This Court has long held that the defendant has an affirmative duty to present evidence showing the inaccuracies contained in the report. State v. Transgrud (Mont. 1983), 651 P.2d 37, 39 St.Rep. 1764; State v. Radi (1979), 185 Mont. 38, 604 P.2d 318. The defendant did not meet this affirmative duty.

The State further denies any inaccuracies in the report. The State contends the report listed the dates of the offenses and the defendant's age. The State further argues the offenses in the adult category were committed by the defendant after the age of sixteen. The State points out that under Canadian law, the age of majority for criminal prosecution purposes is sixteen. Canadian Revised Statute, Chapter J-3. (1970); D. Steward, Canadian Criminal Law at p. 301 (1982). All of the Canadian offenses listed under the "adult" section of the presentence report were in fact committed after the defendant reached sixteen years of age.

12

Therefore, the State urges the fact that they were adult offenses in the jurisdiction in which they were committed should properly be a factor considered by the sentencing court.

Even if the four convictions at issue were excluded we find the remaining eight convictions, including:

(i)    a parole violation of carrying a gun into an automobile;

(ii)    possession of narcotics;

(iii)   breaking/entering and theft;

(iv)    felony theft;

(v)     auto theft;

(vi)    drunk driving;

(vii)   escape; and

(viii) possession of narcotics,

more than sufficient to support the District Court's conclusion that the defendant had "a considerable history of criminal activity and involvement."

The defendant was ordered to submit to a presentence interview on February 24, 1983. The defendant alleges that the statements made to the probation officer and the use of those statements in the sentencing procedure violated defendant's Fifth Amendment privilege against compelled self incrimination. The defendant alleges the presentence report was incriminating in particular, the reference to the defendant's criminal record, the defendant's version of the crime and the defendant's prior use of drugs and alcohol. The defendant submits that the District Court's reliance upon the presentence report violated his Fifth Amendment rights established in Estelle v. Smith (1981), 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d. 359.

13

In *Estelle*, the defendant was indicted in Texas for murder. The state trial judge, ordered a psychiatric evaluation of defendant for the limited, neutral purpose of determining his competence to stand trial. The psychiatrist's testimony stated in substance that defendant would be a danger to society. The federal court vacated the death sentence because it found constitutional error in admitting the psychiatrist's testimony at the penalty phase. The United States Supreme Court affirmed, holding the Fifth Amendment privilege extends to the penalty phase of a capital trial. Estelle v. Smith, supra, 451 U.S. at 462-463.

We find the *Estelle* decision readily distinguishable from the case at bar. First, in *Estelle*, the defendant's counsel at the trial made an immediate motion to exclude the psychiatric testimony. Here, the defendant was given the opportunity to object to the presentence report and did not do so on this ground at any time either during the original sentencing procedure or during the proceedings on his motion to reconsider sentence. The defendant had the obligation to make a record in the trial court to support his allegation on this issue and he did not do so. Second, the controversy in *Estelle*, involved the admissiblity of testimony by a psychiatrst. In the present case, the presentence investigation is challenged. Finally, the Supreme Court in *Estelle* ruled that "volunteered statements . . . are not barred by the Fifth Amendment . . . " However, the defendant's statements to the psychiatrist "were not given freely and voluntarily without any compelling influences, and, as such could be used as the State did at the penalty phase only if respondent had been apprised of his rights . . ." *Estelle*, supra, 451 U.S. at 469. The State urges the record in the instant matter does not disclose an

14

Estelle violation. We agree. The defendant's statements to the probation officer were both voluntary and cumulative. The presentence report resulted from the actions defendant elected during the course of the proceedings. The defendant at the hearing on his motion to change his plea to guilty testified that he was guilty of the crimes charged. The defendant testified to his criminal history, his prior use of drugs and his social background. Defendant's own testimony confirmed the statements made during the presentence interview. The Legislature of the State of Montana statutorily implemented policy and procedure of the presentence investigation. Section 46-18-111, MCA requires the preparation of a presentence report:

> "No defendant convicted of a crime which may result in commitment for one year or more in the state prison shall be sentenced or otherwise disposed of before a written report of investigation by a probation officer is presented to and considered by the court unless the court deems such report unnecessary."

The legislature has also promulgated what the contents of the presentence investigation report should include:

> "Whenever an investigation is required, the probation officer shall promptly inquire into the characteristics, circumstances, needs, and potentialities of the defendant; his criminal record and social history; the circumstances of the offense; the time the defendant has been in detention; and the harm to the victim, his immediate family, and the community. All local and state mental and correctional institutions, courts, and police agencies shall furnish the probation officer, on request, the defendant's criminal record and other relevant information. The investigation shall include a physical and mental examination of the defendant when it is desirable in the opinion of the court." Section 46-18-112, MCA.

The statute provides the manner in which the report shall be used. "The judge may, in his discretion, make the

15

investigation report or parts of it available to the defendant or others. . . such reports shall be part of the record . . . " Section 46-18-113, MCA. We find that the presentence report is consistent with the purposes and rationale established by the legislature for requiring a presentence investigation. State v. Radi (1979), 185 Mont. 38, 604 P.2d 318. The report was properly considered by the sentencing judge. The report provided him with a fair and objective review of defendant's history and provides no basis to remand for a further resentencing hearing.

We now turn to defendant's contention that the parole officer's recommendation for the death penalty violated the defendant's rights. The probation officer's presentence report was prepared and filed on March 7, 1983, prior to the imposition of the death penalty and the filing of the defendant's motion to reconsider sentence. The report contained a recommendation that the defendant receive the death penalty. The defendant urges the District Court invited and relied on the presentence report and investigation recommendation for the death penalty. Specifically, the defendant argues the parole officer who prepared the report was not bound by the specific and limited statutory guidelines imposed upon the sentencing authority by Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d. 859; Jurek v. Texas (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929; Proffitt v. Florida (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d. 913; Furman v. Georgia (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346.

We find no merit to this contention. Section 46-18-302, MCA, authorizes the sentencing judge to consider the widest possible scope of inquiry when determining the sentence to be imposed.

16

> "In the sentencing hearing, evidence may be presented as to any matter the court considers relevant to the sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, and mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court considers to have probative force may be received regardless of its admissibility under the rules governing admission of evidence at criminal trials. . . . " Section 46-18-302, MCA. (Emphasis supplied.)

The United States Supreme Court has spoken upon the sentencing judge's discretion to use the presentence report in Williams v. New York (1949), 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed 1337, in which the Court stated:

> ". . . highly relevant -- if not essential -- to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied the opportunity to obtain pertinent information by a requirement of ridged adherence of restricted rules of evidence properly applicable to the trial. . . [probation] reports have been given a high value by conscientious judges who want to sentence persons on the best available information rather than on guesswork and inadequate information . . ." Williams v. New York, 337 U.S. at 247-249,

The Montana Supreme Court has also affirmed a sentence in which a presentence report included a sentence recommendation. In State v. Stephens (1982), 198 Mont. 140, 645 P.2d 387, we stated:

> "There is no requirement that the sentencing judge adopt the recommendation of the presentence report or that he state reasons for any discrepancy between the recommended sentence and the one actually imposed. The sentencing judge must only specify reasons why the sentence was imposed. State v. Stumpf (Mont. 1980), 609 P.2d 298, 37 St.Rep. 673; Cavanaugh v. Crist (Mont. 1980), 615 P.2d 890, 37

17

St.Rep. 1461. . ."   State v. Stephens, 645 P.2d at 391.

The District Court's findings of fact and conclusions of law specified the reasons for the sentence imposed. At most, the report was merely an additional factor the court was allowed to consider when imposing the sentence. Accordingly, we hold the presentence report containing a sentence recommendation did not violate the defendant's rights.

The defendant next claims the District Court ignored certain mitigating factors which in the aggregate require leniency in this case. The mitigating circumstances specifically enumerated by the defendant include:

(1) eleven letters commending the defendant's character;

(2) Dr. Stratford's testimony that the defendant was suffering a "depersonalization" episode when he shot the victims;

(3) the defendant's cooperation with authorities;

(4) Rodney Munro's testimony that he stabbed Thomas Running Rabbit before the defendant shot him;

(5) the evidence of drug use; and

(6) the defendant's testimony that he intended to rehabilitate himself.

The District Court was required to take into account the aggravating and mitigating circumstances set forth in section 46-18-303, MCA and section 46-18-304, MCA consecutively. "The court . . . shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency." section 46-18-305, MCA.

18

Defendant contends there was evidence of mitigating factors present and the District Court did not give proper consideration to evidence when making its findings, conclusions and when rendering judgment. In Montana, the District Court is required by section 46-18-305, MCA to consider and compare aggravating and mitigating circumstances and can impose the death penalty only if there exists at least one aggravating circumstance and no mitigating circumstances of sufficient substantiality to call for leniency.

We are directed by section 46-18-310, MCA to consider whether evidence supports the sentencing court's findings regarding aggravating and mitigating circumstances. We make such an assessment based upon our independent review of the trial court record. In so doing, we are not usurping the position of the District Court as the primary entity in Montana's system of criminal jurisprudence, rather we mean to insure that the death penalty, unique in its severity and irrevocable, is not wantonly or arbitrarily and capriciously imposed. State v. Coleman (1978), 185 Mont. 299, 605 P.2d 1000, cert. denied, 446 U.S. 970, reh'g. denied, 448 U.S. 914, (1980); Gregg v. Georgia, supra, 428 U.S. 153; Furman v. Georgia, supra, 408 U.S. 238.

The defendant does not raise an issue with the District Court's determination that beyond a reasonable doubt "aggravating circumstances" as set forth in section 46-18-303(5), MCA, and section 46-18-303(7) existed.

This statute, in pertinent part states:

> "(5) The offense was deliberate homicide and was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person.
>
> " . . .

> "(7) The offense was aggravated kidnapping which resulted in the death of the victim." Section 46-18-303, MCA.

Clearly the evidence in this case supports the finding of aggravating circumstance. The defendant had been a deliberate and voluntary participant in the kidnapping and subsequent homicide of the two victims.

The defendant contends that one or more of the "mitigating circumstances," provided in section 46-18-304, MCA existed and were sufficiently substantial to call for leniency. Several of the mitigating circumstances enumerated in section 46-18-304, MCA, are relevant. Specifically, the circumstances in pertinent part, include:

> "Mitigating circumstances are any of the following:
>
> "(1) the defendant has no significant history of prior criminal activity.
>
> "(2) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
>
> ". . .
>
> "(4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
>
> ". . .
>
> "(8) Any other fact that exists in mitigation of the penalty." Section 46-18-304, MCA.

The defendant presented evidence of his character and prior criminal record which he contends section 46-18-304, MCA permits the trial court to consider as mitigating circumstances. Therefore, the defendant argues, it follows that letters from supportive friends commending the defendant's character and a record showing no prior crimes of violence should be noted by the sentencing count. Further, the defendant's use of alcohol and LSD should also be noted

20

as mitigating circumstances. In support of this conclusion, defendant cites to a United States Supreme Court decision, Lockett v. Ohio (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973. In Lockett, the United States Supreme Court held that the Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any other circumstance of the offense that the defendant proffers as a basis for a sentence less than death. The Supreme Court in Eddings v. Oklahoma (1982), 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1, expanded Lockett, supra, stating the courts must consider all relevant mitigating evidence.

We find the mitigating circumstances raised by the defendant were properly discounted by the District Court. Defendant's contention that Rodney Munro had stabbed Running Rabbit before the defendant shot him constitutes a mitigating circumstance is not supported by the record. The affidavit filed in support of the information stated that the medical examiner determined the death of Running Rabbit was caused by a .22 caliber gunshot wound to the head. In the face of the evidence of record, defendant cannot now argue that he was not responsible for Running Rabbit's death.

Moreover, against the record of this brutal crime, we cannot say that the defendant's lack of prior violent criminal activity is a factor sufficiently substantial to call for leniency. In State v. Coleman (1979), 185 Mont. 229, 605 P.2d 1000, cert. denied, 448 U.S. 914, (1980), we summarily rejected defendant's contention that a lack of prior criminal activity required leniency in the sentence. State v. Coleman, supra, 605 P.2d at 1019-1020. In the present matter the record discloses that the defendant had a

long record of criminal behavior and while it is in dispute as to whether the offenses prior to the homicide constituted violent crimes, the defendant has demonstrated his capacity for violence in the murders of Mad Man and Running Rabbit.

The defendant also maintains the effects of drugs and alcohol is supportive of the mitigating circumstances enumerated in section 46-18-304, MCA, regarding the influence of extreme mental or emotional disturbance and the capacity of the defendant to appreciate the criminality of his conduct.

As against the defendant's contention that he was intoxicated by the use of alcohol or drugs at the commission of the crime, it is pertinent to observe the defendant's level of consciousness and physical dexterity as exhibited by the record:

(i) Prior to Mad Man and Running Rabbit offering the three a ride, the defendant and his companions planned a car theft scheme.

(ii) The defendant was able to aim the rifle at each man to effectuate the killing with one shot.

(iii) The defendant was able to load the single-shot bolt action rifle once before shooting Mad Man and again before shooting Running Rabbit.

This is evidence from which the District Court could conclude and doubtless did conclude that the defendant's faculties were not so far prostrated by intoxication as to render intoxication as a circumstance requiring mitigation.

The defendant himself described the effects of the drugs and alcohol as a "light buzz" and testified that he knew what he was doing when he killed Mad Man and Running Rabbit. This was completely consistent with Dr. Stratford's conclusions that, with the exception of the "depersonalization" episode, the defendant exhibited none of

22

the classic symptoms of LSD intoxication at the time of the offense, based on the defendant's own description of his actions and mental state.

The District Court stated in its findings of fact and conclusions of law:

> "That the defendant voluntarily and unhesitatingly ingested substantial quantities of alcohol on the days these crimes were committed, and numerous tablets or 'hits' of LSD on the days prior thereto, does not relieve him of responsibility for his actions. . . despite the presence of alcohol and any residue of drugs in his system, there is no doubt that the defendant knew exactly what he was doing on August 4, 1982. As the court specifically found in March of 1983 'none of the offenses were committed while the defendant was under the influence of a mental or emotional disturbance but they were in fact calculated by him in advance and carried out in a cold and detached fashion while the defendant was entirely aware of the circumstances and his actions. . .
>
> "'In addition today as in March of 1983, the court entertains no doubt whatsoever that the defendant's capacity to appreciate the criminality of his conduct, and to conform his conduct to the requirements of law, was complete and unimpaired. . .'"

We find there was substantial evidence to support the District Court's rejection of intoxication as a mitigating circumstance.

Finally, we agree with the State's assertion that the defendant's intention to seek rehabilitation must simply be viewed as self-serving. Accordingly, we hold the District Court was correct in its conclusion that no mitigating circumstance was sufficiently substantial to call for leniency.

The defendant next attacks the constitutionality of the death penalty provision. Section 46-18-304, MCA lists eight statutory mitigating circumstances, including:

23

" (2) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

" . . .

"(4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." (Emphasis supplied.)

The defendant argues that by requiring "extreme" mental or emotional disturbance and "substantial" impairment the statutes by implication exclude consideration as mitigating circumstances of disturbances and impairments which are less than extreme or substantial. The United States Supreme Court examined the mitigating circumstance requirement that the impairment must be "substantial" or that the mental or emotional disturbance be "extreme" in Eddings v. Oklahoma, supra, 455 U.S. 104. The Court reasoned that the "quality" or "weight" of the mitigating evidence was not determinative of the issue, but stated the sentence may determine the weight to be given relevant mitigating evidence. However, they may not give it no weight by excluding such evidence from their consideration. Eddings, supra, 455 U.S. at 115.

The State submits that subsection (8) of section 46-18-304, MCA, which allows the court to consider "any other fact that exists in mitigation of sentence" resolves this issue. We agree. In State v. Coleman, supra, 605 P.2d at 1017, we held that Montana's death penalty statute, specifically section 46-18-304, MCA, was constitutionally sound under the United States Supreme Court decision Lockett v. Ohio, supra, 438 U.S. 586. We likewise find this statute meets the constitutional mandate established in Eddings v. Oklahoma, supra, 455 U.S. 104. Montana's statute clearly indicates the sentencing body should consider "any other fact existing in mitigation of the penalty." Section

24

46-18-304(8), MCA. This provision clearly allowed the District Court to consider any mental or emotional disturbance or impairment of capacity which did not rise to the level set forth in section 46-18-304(2), MCA. The defendant presented no evidence that showed the District Court construed the statute any other way. We are clearly convinced that the District Court construed the provision within the gravamen of section 46-18-304, MCA.

The defendant next argues that the death penalty statute is unconstitutional because the sentencing judge is given the discretion to decide the criteria to be applied in evaluating mitigating circumstances and whether the mitigating factors outweigh the aggravating circumstances. The defendant submits this practice makes any prediction on whether the death penalty will be imposed somewhat hazardous and constitutes a violation of defendant's Eighth Amendment rights. In support of this contention, defendant cites to an Eleventh Circuit Court of Appeals decision, Moore v. Balkcom (11th Cir. 1983), 716 F.2d 1511. This case is in direct conflict with an array of United States Supreme Court decisions, in particular, Eddings v. Oklahoma, supra, which specifically held that the sentencing authority must have unbridled discretion to consider any perceived mitigating circumstance. Moreover, the capital sentencing statutes approved by the United States Supreme Court in Gregg v. Georgia, supra, 428 U.S. 153; Proffitt v. Florida, supra, 428 U.S. 242; and Jurek v. Texas, supra, 428 U.S. 262; provided the states with strict statutory guidelines and procedures when imposing capital sentences. The capital sentencing statutes were rigorously challenged and extensively reviewed by the United State Supreme Court. We hold Montana's death penalty statutes are not unconstitutional on this ground.

The defendant next claims error because the defendant's motion for a second psychiatric evaluation was denied.

The defendant initiated the first psychiatric examination after he filed the motion for reconsideration of his sentence. The court held a hearing on the motions, at which the defendant testified contrary to his prior testimony that he had ingested large quantities of LSD in the days prior to the killings, that he had consumed a quantity on the day of the killings, and that he experienced a "dissociative state" during the killings. The court granted defendant's motion for the psychiatric evaluation. The court concluded that the defendant's allegations could present evidence of mitigating circumstances which should be heard by the court and ordered that the defendant be examined by Dr. William Stratford, a Missoula forensic psychiatrist. The defendant's motion sought the opinion of a psychiatrist to determine if the defendant's use of LSD and alcohol prior to the crime may have impaired his mental capacity to appreciate the wrongfulness of his actions. If so, such drug use might establish a mitigating factor reducing his death sentence to life in prison.

The court directed Dr. Stratford to resolve, if possible, the inconsistencies between the defendant's testimony at the arraignment of February 24, 1983, the sentencing hearing March 23, 1983, and the May 3, 1983, hearing on his motion to reconsider sentence. The court further instructed Dr. Stratford to determine which version of the facts was more credible. The court requested Dr. Stratford to consider several questions regarding the defendant's actions on August 4, 1982:

(1) the effect of alcohol or drugs on the defendant's state of mind;

26

(2) whether the defendant acted under extreme mental or emotional stress;

(3) whether the defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired; and

(4) a diagnosis of the defendant's mental condition.

On June 20, 1984, the defendant filed a motion objecting to the portion of the court's order directing Dr. Stratford to resolve the conflicts in the defendant's testimony on the ground that: it interfered with the "doctor-patient" relationship; asked for an opinion beyond the doctor's expertise; and was generally unfair and unconstitutional. The court amended its order and directed Dr. Stratford to assume the truth of the defendant's second version of the events leading up to the killings and render his opinion of the defendant's mental state on that basis.

Dr. Stratford interviewed the defendant on two occasions at the Montana State Prison and considered the transcripts of the prior proceedings, the presentence report, and witness statements provided by the defendant. Dr. Stratford also interviewed Rodney Munro and Andre Fontaine and secured a psychological profile of the defendant from Dr. Herman Walters.

Dr. Stratford testified in substance that: the drugs and alcohol did not have a substantial effect on the defendant's state of mind; that he was not acting under extreme mental or emotional stress; and that he had the capacity both to appreciate the criminality of his conduct and to conform his conduct to the requirements of law. Dr. Stratford was unable to diagnose the defendant, but found that "his personality structure and history is consistent with an anti-social personality disorder."

27

Following this hearing, the defendant filed a motion for a second psychiatric evaluation. The motion stated that the court's imposition of investigative duties on Dr. Stratford had compromised his impartiality; that Dr. Stratford had deviated from the defendant's second version of the facts in reaching his conclusions; and that the court's order had excluded Dr. Stratford's consideration of other unspecified mitigating factors in reaching his conclusion. The defendant submits that he did not initiate the additional investigation concerning his credibility, nor did the defendant consent to any investigation of his credibility to be used against him at his sentencing hearing. The defendant argues when the court requested the additional investigation, Dr. Stratford's role changed and he became an agent for the State. This, the defendant submits, triggered defendant's Fifth Amendment protections. The defendant maintains the inclusion of Dr. Stratford's statements is a violation of the constitutional provisions set forth in Estelle v. Smith, supra, 451 U.S. 454. In Estelle, the Court ordered a psychiatric examination of the defendant to determine if he was competent to stand trial. The defendant was found competent and found guilty of capital murder. The psychiatrist testified at the sentencing hearing that the defendant would commit similar crimes in the future if given the opportunity. The defendant challenged the psychiatrist's testimony as incriminating and violative of his Fifth Amendment privilege. The Court concluded:

> "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statement can be used against him at a capital sentencing proceeding. . . ." Estelle, 451 U.S. at 468.

The Defendant urges the ruling in Estelle governs the case at bar.

This case is distinguishable from Estelle on two grounds. First, the issue of compulsion is not present here. The defendant initiated the psychiatric evaluation after the entry of a plea of guilty. As a result, any Fifth Amendment privilege with regard to his statements made during the interview were waived. Second, unlike Estelle, the defendant in this case had access to the advice of counsel before the psychiatric evaluation took place.

The defendant concedes that he did initiate the psychiatric evaluation after the plea of guilty. The purpose of the requested evaluation was to determine if the defendant's heavy use of LSD and alcohol prior to the crime may have impaired his mental capacity to appreciate the wrongfulness of his actions. However, the defendant argues when the court requested the additional investigation, Dr. Stratford's role changed and he became an agent for the State recounting unwarranted statements made in a post-arrest custodial setting. The defendant urges this is when the ruling of Estelle attaches.

The defendant fails to comprehend the fundamental basis of our criminal justice system. Three actors play a role in the judicial arena: (1) the defendant; (2) the State; and (3) the court. The court is not an advocate, but rather the court is a neutral and detached arbitrator insuring fair play in the criminal proceeding. The court, by requesting the psychiatrist to examine the defendant was properly within the confines of the law. Section 46-14-311, MCA, states:

> "Whenever a defendant is convicted on a verdict or a plea of guilty and he claims that at the time of the commission of the offense of which he was convicted he was suffering from a mental disease or defect

29

which rendered him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, the sentencing court shall consider any relevant evidence presented at the trial and shall require such additional evidence as it considers necessary for the determination of the issue <u>including a psychiatric examination of the defendant and a report thereof as provided in sections 46-14-202 and 46-14-203</u>." (Emphasis supplied.)

Under direct examination, Dr. Stratford testified to the manner he perceived his role under the District Court order:

"Q. [By Mr. Doran] How did you perceive your role if you might summarize it as it was sticking to the order?

"A. My understanding of that was that I was to contrast comments made at different times and try to render an opinion as to whether or not--as to which statements were more accurate. Additionally, I was asked to assume that the later statements by Mr. Smith were correct and to follow through with that assumption and then answer the questions which Judge Keedy dictated and detailed in the court order.

"Q. So, do you perceive your role pursuant to the order as being an investigator on one hand and on the other hand performing a psychiatric evaluation of the defendant as it may be affected by the defendant's statements that he used drugs or alcohol prior to the offense?

"A. I perceived my role as using my background and professional training and experience in prior examination of the defendant's criminal conduct and drug knowledge to try to utilize that background to answer the questions which were asked of me by Judge Keedy so I don't perceive myself in an investigative role at all."

Defendant's contention, that Dr. Stratford acted as an agent of the State, is legally groundless.

Finally, the defendant argues when the court directed Dr. Stratford to resolve inconsistencies between the defendant's testimony and to determine which version of the facts

30

was more credible, this resulted in Dr. Stratford doubting the credibility of the defendant. However, we find the two substantive issues involved, the amount of drugs and alcohol consumed and the resulting effect; and the "depersonalization" mental state, were based upon defendant's second version of the facts. Dr. Stratford testified that he assumed that the defendant had ingested "eight or nine hits" of LSD the day before the crimes and consumed "at least ten or twelve beers" on the day of the crimes. Dr. Stratford's assumption was based on the information provided by the defendant during the two interviews conducted at the prison. There was no testimony at the hearings prior to Dr. Stratford's examination indicating that Smith took "40 to 50" hits of LSD. However, the testimony of Dr. Stratford clearly reveals that the defendant had been using a "substantial amount" of LSD "almost on a daily basis" during the month before the crimes. According to Dr. Stratford, continued use of LSD quickly gives rise to a tolerance which requires larger and larger doses to produce significant effects. Therefore, the defendant's repeated use of LSD would cause significant doses to have little effect. Dr. Stratford testified that defendant's testimony established the absence of clinical symptoms indicating the drugs and alcohol significantly affected the defendant's mental state when he committed the crimes. In any event, Dr. Stratford's testimony that his opinion would not change even assuming the truth of Munro's later testimony removes any force from the defendant's argument. In addition, the defendant argues, the doctor's testimony included certain incriminating statements made by defendant concerning the extent of time that the "dissociative state" lasted. Dr. Stratford testified that he discounted the affect of the "dissociative state" because the

31

defendant had told him it had only lasted a few seconds. This conclusion is fully consistent with the defendant's prior testimony.

The defendant, during oral argument, maintained that Rodney Munro's mental state at the time of the crime should be a factor when determining the mental state of the defendant. To say the least, this argument is wholly inadequate. First of all, Rodney Munro and the defendant are two different individuals. No evidence, not even the defendant's testimony, indicated any similarity between the mental state of Rodney Munro and the defendant. The only factor the two had in common, was the fact that they both allegedly ingested large quantities of drugs and alcohol. Finally, greater weight will be given to the opinion of a psychiatrist professionally qualified to evaluate such individuals, rather than an individual intoxicated at the time of the crime.

Finally, the defendant asserts that the court limited Dr. Stratford's inquiry to the statutory mitigating circumstances of "extreme mental or emotional stress" and "substantial impairment" of mental capacity, section 46-18-304(2), MCA, thereby excluding consideration of non-statutory mitigating evidence of mental or emotional stress which was not extreme or impairment which was not substantial. Defendant cites to Eddings v. Oklahoma, supra, 455 U.S. 104, in which the Supreme Court ruled, the inclusion of these words in the statute regarding mitigating factors limited the doctor's ultimate findings and operated as a denial of the defendant's Eighth Amendment rights.

The State contends the defendant's reliance on Eddings, supra, is misplaced. We agree. In Eddings, the Supreme Court held that a state's death penalty statute must allow

the sentencer to consider nonstatutory mitigating circumstances. No evidence suggests that the District Court in the present matter was constrained to reject mitigating factors not set forth in the statute. Accordingly, we find that the trial court did not err in denying the defendant's motion for a second psychiatric evaluation.

The defendant asserts as his next issue on appeal, that his Sixth and Fourteenth Amendment rights, under the United States Constitution, were violated when the District Court issued its final order without holding a hearing at which the defendant could be present to hear the ruling on his motion to reconsider.

Section 46-18-102, MCA, states:

"(1) The judgment shall be rendered in open court.

"(2) If the verdict or finding is not guilty, judgment shall be rendered immediately and the defendant shall be discharged from custody or from the obligation from his bail bond.

"(3)(a) If the verdict or finding is guilty, sentence shall be pronounced and judgment rendered within a reasonable time.

"(b) When the sentence is pronounced, the judge shall clearly state for the record his reasons for imposing the sentence."

The defendant contends that he had a right to hear the sentence imposed in open court pursuant to section 46-18-102, MCA. He argues that his right to react immediately to the sentence, through his own volition or through his attorney as to any legal reason why the sentence should not be pronounced, was denied. As authority for the principle involving defendant's right to be present extends to the sentencing as well as the guilt portions of capital trial, defendant relies upon Proffitt v. Wainwright (11th Cir. 1982), 685 F.2d 1227. We find Proffitt, supra, lacks direct application to

33

this case. The defendant in Proffitt was denied his right to be present during the sentencing portion of the trial. Here, the defendant was merely not present during the court's judgment on the motion to reconsider. The record clearly shows that the defendant appeared in person at the imposition of the sentence and at all proceedings conducted on his motion to reconsider. We do not agree that the District Court's amended order was the functional equivalent of a new sentence. "The defendant is not required to be present at proceedings occurring after the verdict, because such proceedings are not part of the trial." State v. Higley (Mont. 1980), 621 P.2d 1043, 37 St.Rep. 1942; State v. Peters (1965), 146 Mont. 188, 405 P.2d 642. The same reasoning applies here.

The defendant next argues that the sentencing court's consideration of nonstatutory aggravating factors invalidates the death sentence.

The presentence report included the following information as to:

    (1)    why the defendant requested the death penalty;

    (2)    the defendant's temper;

    (3)    the defendant's previous drug and alcohol use;

    (4)    the defendant's propensity for violence;

    (5)    the defendant's motivations;

    (6)    the defendant's lack of remorse; and

    (7)    a statement that the defendant was an extreme danger to society.

The defendant claims the above mentioned information was set forth in the court's final judgment as aggravating factors in imposing the death penalty. The defendant alleges the admission and consideration of nonstatutory aggravating

34

circumstances violated Furman v. Georgia, supra, 408 U.S. 238.

The basic tenant of the Furman decision consists of an attack against discretion and the resulting arbitrariness in capital cases. The United States Supreme Court required the states to follow strict statutory guidelines and procedures when imposing capital sentences. The defendant cites to an array of federal cases which require courts to adhere to specific and detailed standards to guide the sentencer in deciding whether to impose the death penalty. Proffitt v. Wainwright, supra, 685 F.2d at 1267; Henry v. Wainwright (5th Cir. 1981), 661 F.2d 56, vacated on other grounds, 457 U.S. 1114, 102 S.Ct. 2922, 73 L.Ed.2d 1326, (1982); Gregg v. Georgia, supra, 428 U.S. 153.

The State submits the defendant misunderstands the operation of Montana's death penalty statute. Section 46-18-302, MCA, explicitly allows the sentencing court to admit "any matter the court considers relevant to the sentence." The statutory aggravating circumstances, of section 46-18-303, MCA, do not serve to limit the admissibility of this evidence. Rather, its function is to narrow the category of capital homicides. Once a statutory aggravating circumstance is found, the defendant is placed in the narrow category of persons who may be subject to the death penalty. This is what the District Court precisely did in its findings of fact and conclusions of law.

The District Court concluded that the defendant had been convicted of aggravated kidnapping, two counts, and deliberate homicide, also two counts, as a result of which the District Court found and determined beyond a reasonable doubt the existence of "aggravating circumstances" as set forth in sections 46-18-303(5) and 46-18-303(7), MCA.

35

Aggravating circumstances are set forth in section 46-18-303, MCA:

> "Aggravating circumstances are any of the following:
>
> "(1) The offense was deliberate homicide and was committed by a person serving a sentence of imprisonment in the state prison.
>
> "(2) The offense was deliberate homicide and was committed by a defendant who had been previously convicted of another deliberate homicide.
>
> "(3) The offense was deliberate homicide and was committed by means of torture.
>
> "(4) The offense was deliberate homicide and was committed by a person lying in wait or ambush.
>
> "(5) The offense was deliberate homicide and was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person.
>
> "(6) The offense was deliberate homicide as defined in (1)(a) of 45-5-102, and the victim was a peace officer killed while performing his duty.
>
> "(7) The offense was aggravating kidnapping which resulted in the death of the victim."

Section 46-18-304, MCA requires the sentencing court to conduct further inquiry into the question of whether there are mitigating cirumstances sufficiently substantial to call for leniency. We hold the statutes do not prevent the court from considering the full range of evidence admitted under section 46-18-302, MCA, and relying on evidence in determining whether there are sufficient mitigating circumstances to call for leniency. The District Court was free to consider a wide range of evidence, including the information submitted on the presentence report. Furthermore, we will not preclude the admissibility of evidence unfavorable to the defendant. This is evidence that the

36

District Court has the right to be aware of and to consider as a probative force when determining the sentence. This precise statutory procedure complies with the United States Supreme Court directive in Zant v. Stephens (1983), ____ U.S. ____, 103 S.Ct. 2733, 77 L.Ed.2d 235.

The United States Supreme Court in California v. Ramos (1983), ____ U.S. ____, 103 S.Ct. 3446, 77 L.Ed.2d 1171, makes clear that the Eighth Amendment requires a state to channel and guide the discretion of the sentencer with objective standards for the imposition of the death penalty, but does not require a state in the process to limit the admissibility of evidence unfavorable to the defendant to the evidence which proves the statutory aggravating factors.

> "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty . . . the jury is free to consider a myriad of factors to determine whether death is the appropriate punishment. In this sense, the jury's choice between life and death must be individualized. 'But the Constitution does not require the jury to ignore other possible factors in the process of selecting . . . those defendants who will actually be sentenced to death.'" 103 S.Ct. at 3456, quoting Zant v. Stephens, 103 S.Ct. at 2743.

Once the District Court found section 46-18-303, MCA, aggravating factors present, the court was free to consider a wide range of evidence including the presentence report. A review of the record and the District Court's findings of fact and conclusions of law reveal no procedural shortcomings. We find no arbitrary or discriminatory infliction of the death sentence.

The defendant's next challenge concerns the District Court's imposition of the death penalty without jury participation in the process.

37

The defendant alleges he was denied not only the right to have a jury sentence him, but also the right to have a jury decide the facts that made him eligible for a capital sentence. The defendant's primary argument is that the laws and practices of most states indicate a nearly unanimous recognition that juries, not judges, are better equipped to make capital sentencing decisions. The defendant urges this Court to follow the legal premise observed in a treatise entitled Trial by Jury and the Reform of Civil Procedure, 31 Harv.L.Rev. 669, 679, (1918). There, the author distinguishes between the province of the jury and that of the judge. The author postulates that the "Law throws upon the [the jury] the whole responsibility of ascertaining facts in dispute, and the judge does not attempt to interfere with the exercise of their unfettered discretion to this respect."

Finally, the defendant claims the aggravating factors a judge finds in a Montana sentencing hearing are additional facts determinative of whether the crime is a capital murder. The defendant refers to an Oregon Supreme Court decision where the intent of the accused was a fact at issue. The court invalidated Oregon's capital punishment provision stating:

> "The death penalty statute, which authorized an enhanced penalty to be imposed based upon determination by the court of the existence of a requisite culpable mental state, a mental state different and greater than that found by the jury, was unconstitutional for denying defendant his right to trial by jury of all the facts constituting the crime for which he was in jeopardy." State v. Quinn (Or. 1981), 623 P.2d 630.

We find the Oregon Supreme Court decision, State v. Quinn, supra, lacks significant credence to the case at bar. In the State of Oregon, the death penalty statute requires the crime of deliberate first degree murder to be

38

established.  The statute provides for a post-trial hearing procedure to determine if the crime was committed with a "greater culpable mental state."  See ORS 163.115, ORS 163.116.  The difference between the Oregon statute and Montana statute is sufficiently substantial to render the case inapplicable.

We hold the defendant's argument is foreclosed by the recent United States Supreme Court decision Spaziano v. Florida (1984), ____ U.S. ____, 104 S.Ct. 3154, ____ L.Ed.2d ____.  The question presented in Spaziano was whether a death sentence could constitutionally be imposed by a trial judge after a jury had reached an advisory verdict recommending life imprisonment.  The United States Supreme Court upheld the sentence, holding that neither the Sixth Amendment right to a jury trial nor the Eighth Amendment proscription of cruel and unusual punishment required that a jury participate in the sentencing process.

> "In light of the facts that the Sixth Amendment does not require jury sentencing, that the demands of fairness and reliability in capital cases do not require it, and that neither the nature of, nor the purpose behind, the death penalty requires jury sentencing, we cannot conclude that placing responsibility on the trial judge to impose the sentence in a capital case is unconstitutional."  Spaziano v. Florida, supra, 104 S.Ct. at 3165.

Defendant maintains only four states--Arizona, Nebraska, Idaho and Montana--totally keep the jury from the sentencing decision.  The fact that a majority of jurisdictions have adopted a different practice, however, does not establish that Montana's capital sentencing procedure is unconstitutionally sound.  The Montana Supreme Court in State v. Coleman, supra, 605 P.2d at 1017, found jury participation in a capital sentencing case was not constitutionally

39

required. "Sentencing by the trial judge is certainly required by Furman v. Georgia, supra. See Gregg v. Georgia, supra, 428 U.S. at 188-195, 96 S.Ct. at 2932-2935. What we do not accept is that, because juries may sentence, they constitutionally must do so." Spaziano, supra, 104 S.Ct. at 3164.

The United States Supreme Court has carefully scrutinized the state's capital sentencing schemes to minimize the risk that the penalty will be imposed in error or in an arbitrary and capricious manner. From Furman v. Georgia, supra, 408 U.S. 238, where the United States Supreme Court struck down the then existing capital sentencing statutes of Georgia and Texas, to Gregg v. Georgia, supra, 428 U.S. 238, we hold there certainly is nothing in the safeguards necessitated by the court's recognition of the qualitative difference of the death penalty from other penalties that requires that the sentence be imposed by a jury. "There is no similar danger involved in denying a defendant a jury trial on the sentencing issue of life or death. The sentencer, whether judge or jury, has a constitutional obligation to evaluate the unique circumstances of the individual defendant and the sentencer's decision for life is final." Spaziano v. Florida, supra, 104 S.Ct. at 3162. This is exactly what the trial court has done. The trial judge conducted an independent review of the evidence and made his own findings regarding aggravating and mitigating circumstances. The trial judge set forth in writing the findings on which the sentence was based. Accordingly, we reaffirm our prior holding that jury participation is not constitutionally required in capital sentencing procedures.

Three additional issues were presented by the defendant in the supplemental brief to the reply brief. All questions

40

on appeal should have been raised in the defendant's initial brief. See Rule 23, Rules of Appellate Procedure. However, by statute, we are required to review all issues presented. Furthermore, because this appeal involves a capital sentence we will examine the merits of the questions presented.

As the next issue on appeal the defendant submits that the District Court imposed the death penalty under the influence of passion, prejudice, and misstatements made by the defendant. At the arraignment hearing held on February 24, 1983, the defendant indicated to the court his desire to receive the death penalty. The defendant contends that he actively attempted to persuade the court that he was an individual deserving of the death penalty. The defendant indicated to the court at the first sentencing hearing held on March 21, 1983 that his mental state was untainted by the use of drugs or alcohol at the time of the incident. He portrayed himself to the court as being an unfit candidate for rehabilitation. He portrayed himself as a violent person, who was likely to harm others in prison or elsewhere. He portrayed himself as having little interest in obtaining employment, being a rebel to society, a dangerous and violent person, and one who acted out of morbid fascination to kill with no remorse for his actions.

However, on May 3, 1983, at the hearing for reconsideration of the sentence, a substantially different defendant is portrayed. The defendant testified to the extent of drugs and alcohol use prior to the crime. The defendant testified that he experienced a type of dissociative state at the time he shot Mad Man and Running Rabbit. He indicated a willingness to change his lifestyle, to rehabilitate himself, and to take counseling for drug and alcohol addiction. In essence, the defendant argues the testimony he offered at the

first hearing, allegedly to convince the court to impose the death penalty, testimony he later recanted, inflamed the passion of the District Court Judge and induced him to impose the death penalty. The State contends this argument was obviously conceived by the defendant as an afterthought. The State points out that no motion was ever filed to disqualify the District Court Judge because of the bias which he allegedly harbored from seeing the defendant testify in favor of his own execution.

We have reviewed the record of this case pursuant to section 46-18-310, MCA, which provides that we shall determine "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor . . . " Section 46-18-310(1), MCA. We find there is no indication that the District Court Judge imposed the death penalty out of passion or prejudice. A review of his sentencing order reveals the District Court's awareness of defendant's "Dr. Jekel and Mr. Hyde" character:

> "The defendant's stated preference as to the appropriate sentence and punishment is of no consequence. Just as his initial request of the death penalty be imposed upon him was seen and treated by the court in its original order as a 'curious element,' and nothing more, the change of mind which he has undergone since March 21, 1983, and his present wish to be spared, are in themselves no more than curious, if predictable subsequent developments. They are peripheral and extraneous circumstances, and must not be brought to bear upon the court's determination of a just and necessary punishment."

A review of the District Court's forty-three detailed written findings and conclusions establish that the District Court carefully and dispassionately considered the evidence before it and properly concluded that the death penalty was appropriate. We hold there is no indication that the

42

District Court imposed the death penalty out of passion or prejudice.

The defendant next argues that the evidence fails to support the District Court's findings of aggravating and mitigating circumstances in support of the death penalty.

The defendant does argue, both on appeal and in the review briefs, that the court did not properly evaluate the evidence of mitigating circumstances. The defendant urges that: (1) his use of drugs and alcohol corroborated with his testimony of a dissociative experience and (2) the letters from supportive friends are factors sufficient to call for leniency.

Defendant's contention has been considered extensively in the foregoing text of this opinion. We find the defendant fails to present additional argument or evidence which warrants a finding of mitigating circumstance.

As to the final issue on appeal, the defendant argues that his sentence is disproportionate and excessive to the penalty imposed in similar cases. He also argues that the sentence is disproportionate to that imposed on his accomplice, Rodney Munro.

Rodney Munro was sentenced to a forty-year term of imprisonment on each of two counts of aggravated kidnapping to extend concurrently with an additional enhancement for the use of a dangerous weapon of ten years to extend consecutively. We hold the defendant's sentence of death for aggravated kidnapping is not excessive or disproportionate when compared to the sentences received by Rodney Munro. Leniency in one case does not invalidate the death penalty in others. Gregg, supra, 428 U.S. at 199, 224-226; also State v. Coleman, supra, 605 P.2d at 1040.

43

Montana law requires the Montana Supreme Court to conduct a comparative proportionality review of the death sentence in this case. Section 46-18-310, MCA, provides:

"The supreme court shall consider the punishment as well as any errors enumerated by way of appeal. With regard to the sentence, the court shall determine;

". . .

"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The court shall include in its decision a reference to those similar cases it took into consideration."

The United States Supreme Court in Gregg, supra 428 U.S. at 206, has stated that the purpose of appellate review in a capital sentencing system is to serve as "a check against the random or arbitrary imposition of the death penalty." It is clear from the decisions of Gregg, supra, 428 U.S. at 204-206; and Proffitt, supra, 428 U.S. at 258-259, that we need not examine every similar case whether appealed or not, rather we need only examine those cases where after conviction the death penalty could have been or was imposed that has reached our attention through the appellate process. We are obligated to define the scope of our review when considering similar cases. We will thus consider cases where the defendant has been charged with kidnapping and murder of the victim of the kidnapping and where the defendant has been charged with aggravated kidnapping where the victim has been killed. Consequently, we are limited in our comparison of cases to an examination of: State v. McKenzie, (1976), 171, Mont. 278, 557 P.2d 1023, vac. 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089, on remand 177 Mont. 280, 581 P.2d 1205, vac. 443 U.S. 903, 99 S.Ct. 3094, 61 L.Ed.2d 871, cert. denied, 443 U.S. 912, 99 S.Ct.

3103, 61 L.Ed.2d 877, on remand 608 P.2d 428, cert. denied, 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507; State v. Coleman, supra, 605 P.2d 1000; and State v. Fitzpatrick (1979), 186 Mont. 187, 606 P.2d 1343, cert. denied, 449 U.S. 891, 101 S.Ct. 252, 66 L.Ed.2d, 118. These are the only cases arising in Montana since 1973, the effective date that the death penalty could be imposed for the crime of aggravated kidnapping in which the victim is killed.

The defendant in McKenzie, supra, was charged with deliberate homicide and aggravated kidnapping as a result of the bludgeoning death of Lana Harding. The District Court imposed the death penalty for both offenses and this Court affirmed following remand from the United States Supreme Court. McKenzie, supra, 581 P.2d 1205. The victim was found draped over a grain drill; partially nude; with a rope tied around her neck; and severely beaten about the head and body. Death had been caused by severe blows inflicted by Duncan McKenzie, the defendant.

In Coleman, supra, Dewey Coleman was sentenced to death following the jury's verdict of guilty of the crime of aggravated kidnapping. The defendant raped Peggy Harstad, beat her about the head with a motorcycle helmet, attempted to strangle her with a nylon rope and finally held her in the Yellowstone River until she drowned.

The defendant in Fitzpatrick, supra, was convicted of deliberate homicide, aggravated kidnapping and robbery and was sentenced to death for the homicide and kidnapping of Monte Dyckman. The victim was found dead lying on the passenger seat of his car with his hands tied behind his back. Monte Dyckman had been shot twice with a gun held less than six-inches from his head. The homicide resulted from the perpetration of the robbery.

45

During oral argument, defense counsel urged this Court to consider that this defendant was not similar to the defendants in the other three capital cases. He argued that the defendant's criminal history did not include violent crimes. We disagree. The defendant had demonstrated his capacity for violence. The record of this brutal crime indicates that the defendant had committed automobile theft on the same day the kidnapping and homicides of Mad Man and Running Rabbit occurred. We will not give mitigating affect to the fact that the defendant had avoided conviction for violent crimes in the past. State v. Coleman, supra, 605 P.2d at 1019-20.

Following an extensive review of capital cases in Montana, one 1947 decision, State v. Palen (1947), 119 Mont. 600, 178 P.2d 862, warrants examination.

In Palen, the defendant initially entered a plea of not guilty. Thereafter, the defendant withdrew his plea of not guilty and entered a plea of guilty. The district court held a hearing to determine the degree of the crime and the punishment to be imposed. At the conclusion of the hearing, the court found the crime to be murder in the first degree and sentenced the defendant to death by hanging. The defendant filed a motion to modify the judgment of conviction so as to substitute life imprisonment for the death sentence. The defendant's motion to modify the judgment was denied. The defendant appealed to this Court. We remanded the case to the district court for the purpose of hearing further evidence on the issue of defendant's mental condition at the time of the homicide produced by alleged intoxication. State v. Palen (1947), 119 Mont. 600, 179 P.2d 862.

A hearing on the defendant's mental condition was held. The trial court held that the capital sentence pronounced originally should not be changed or modified. The defendant

again appealed to this Court. We upheld the trial court's judgment and sentence. State v. Palen (1947), 120 Mont. 434, 186 P.2d 223. We recognize that in Palen, the defendant was sentenced under section 94-2502 RCM, prior to the 1973 amendments regarding sentencing in capital cases. Nevertheless, Palen is procedurally similar in that both defendants initially plead not guilty, then withdrew their pleas of not guilty and entered pleas of guilty and appealed their sentence of death. Furthermore, in both cases the defendant sought to establish intoxication as a mitigating circumstance.

In light of the foregoing caselaw, we conclude that the sentence of death for aggravated kidnapping and deliberate of Thomas Running Rabbit, Jr. and Harvey Mad Man, Jr.was not excessive or disproportionate to the penalty in similar cases.

During oral argument defendant's counsel made much of the fact that the defendant was a product of penal institutions. The defendant's contention must be viewed as a mechanism for mercy. As Dean G.H. Wigmore wrote, "mercy is an act of compassion, not of reason; it defies reason in the shape of the law. . . " We live in an age when the number of crimes committed increases nearly every year. To many citizens, the incidents and prevalence of violent crime is the most serious issue facing our system. We are not oblivious to the fact that this is truly a matter of life and death. We also recognize that Robert Allen Smith was no half-drunk pool player who got into a cut/scrape brawl on a Saturday night in a bar. Harvey Mad Man, Jr. and Thomas Running Rabbit, Jr. played a game of pool and drank beer with the defendant hours before the killings. The two victims offered

the defendant and his companions a ride. Their friendly gesture resulted in their death.

The trial court scrupulously adhered to the death penalty statute and at every stage of the proceeding protected the rights of the accused. The trial judge conducted this hearing; weighed the evidence; passed on the credibility of the witnesses and assumed the solemn burden of imposing the sentence. In pronouncing judgment, the trial court declared:

> "The defendant and no others have the means, the opportunity, and the will to avoid all contact on its part with drugs and alcohol. The defendant himself, and no one else, had and might have exercised control over his behavior and actions on the day Harvey Man Man, Jr. and Thomas Running Rabbit, Jr. lost their lives. His choice to execute them was conscious, calculated and deliberate. As such, the court finds nothing in his motivation or actions to mitigate or relieve the atrocity and permanence of his crimes."

In summary, we have examined all the specifications of error raised by defendant and find no reversible error. The sentence of death is affirmed.

John Conway Harrison
Justice

We concur:

J. A. Turnage
Chief Justice

Frank B. Morrison

John C. Sheehy

L. C. Gulbrandson

William E. Hunt
Justices

48