**Ronald Allen SMITH, Petitioner–Appellant,**

v.

**Jack McCORMICK,\* Warden, Montana State Prison, et al., Respondents–Appellees.**

No. 88–4115.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 3, 1989.

Decided Sept. 7, 1990.

State Prison.

1154

Cliff Gardner, Fiedler Gardner & Derham, San Francisco, Cal., for petitioner-appellant.

Betsy Brandborg, Asst. Atty. Gen., and Dorothy McCarter, Asst. Atty. Gen., Helena, Mont., for respondents-appellees.

Before FLETCHER, FERGUSON, and FERNANDEZ, Circuit Judges.

FERGUSON, Circuit Judge:

Ronald Smith appeals from the U.S. District Court's summary judgment denying his petition for writ of habeas corpus. Smith, sentenced to death for the murder of two Native American men in Montana, asserts numerous constitutional violations in the sentencing process.

## I.

On August 3, 1982, Ronald Smith, then 24 years old, hitched a ride from the town of Red Deer in Alberta, Canada, toward the U.S.–Canadian border. He was accompanied by two other men, Rod Munro, a friend with whom Smith had spent time in jail, and Andre Fontaine, someone Smith had known only a few months. The three young men, lacking stable employment and having served time in Canadian jails, had decided they had no future in Canada and would set off for Mexico. Smith and Munro were heavy drug users; Smith apparently had begun using heroin and hallucinogens as a child, and had been consuming 10 to 20 tablets of LSD a day during the summer of 1982.

Without a car or much money, the three walked across the U.S. border into Montana and hitchhiked south, coming to East Glacier, Montana on August 4. Munro had purchased a large quantity of LSD for the trip; he testified that he and Smith consumed at least 40 "hits" each during August 3 and August 4.

In East Glacier the young men stopped in a bar at approximately one o'clock in the afternoon. There they drank beer and played pool with some others in the bar, including Harvey Mad Man, Jr., and Thomas Running Rabbit, Jr. After about an hour, Smith, Munro and Fontaine bought more beer to take with them and started walking west along Highway 2, hoping to hitch a ride. They were picked up by Mad Man and Running Rabbit. The five men, all drinking, drove until Mad Man and Running Rabbit decided to stop and urinate in some roadside bushes.

When Mad Man and Running Rabbit returned to the car, Smith produced a gun, and Munro a knife, which they had carried with them from Canada. Intending to steal the car, Smith and Munro walked Mad Man and Running Rabbit back into the bushes. There Smith shot Mad Man. Smith then reloaded his gun and shot Running Rabbit. The two victims were killed instantly. Smith and Munro then returned to the car, and drove off. The car was recovered when Fontaine and Munro were later arrested for armed robbery in California. Fontaine linked Smith to the killings. Smith was arrested in Wyoming.

Smith was charged with two counts of aggravated kidnapping and two counts of deliberate homicide. On November 1, 1982, Smith pled not guilty to the crimes.

On February 23, 1983, Smith moved to change his plea to guilty, and asked for the death penalty. He stated that he wanted a death sentence because he had received threats against his life from Native American prisoners, and because, having spent

nearly half his life in prison, he saw no reason to continue living in prison.

Following acceptance of the guilty plea, a sentencing hearing was held March 21, 1983, to consider aggravating and mitigating circumstances. The state presented no witnesses at the hearing. Smith testified, reiterating his request to die. He asserted that there were no circumstances mitigating his crimes. At the conclusion of the hearing, the court ordered Smith's execution.

Subsequently, however, Smith filed a motion for reconsideration of the death sentence and for the assistance of a court-appointed psychiatrist. At hearings on the motion for reconsideration on May 3, 1983, and December 1, 1983, Smith testified that when he changed his plea to guilty and asked to die he had been deeply depressed, and had purposefully omitted reference to any mitigating factors. He explained that upon his arrest for the shootings he had been placed in solitary confinement without fresh air, sunlight, or exercise. He now sought reconsideration of the sentence because, having been transferred to better prison conditions, he was more optimistic about surviving in prison, and because he had been visited by his family, who urged him to live.

At the hearings on reconsideration of the death sentence, Smith stated that for the previous five years he had been addicted to LSD, and that on the day of the shooting he had been in a dissociative state. Fontaine and Munro also testified and confirmed Smith's drug and alcohol use. Munro, who had consumed LSD and alcohol with Smith, testified that he (Munro) was hallucinating on the day of the crime.

Smith discussed his criminal background, indicating that none of his previous crimes had involved violence. He stated his interest in rehabilitation. He brought forward character evidence supporting his claim that violence was out of character, and that he was capable of rehabilitation. He continued to admit guilt for the shootings.

In light of the contradictory testimony on possible mitigation, the trial court on June 10, 1983 ordered a psychiatrist to examine Smith and prepare a report for the court. Defense counsel objected to the psychiatrist's reporting directly to the court rather than acting as an aid to the defense. Notwithstanding the objection, the psychiatric examination was held under direction of the court and reported directly to the court. The examination was limited to the specific question of mental capacity on the day of the killings.

The psychiatrist testified at the December 1, 1983 reconsideration hearing. In the psychiatrist's opinion, even assuming use of large quantities of LSD immediately before the crime, such usage did not substantially affect Smith's mental capacity or actions. Following this testimony, Smith petitioned for the appointment of another psychiatrist. That motion was denied, and on February 15, 1984, the trial court filed its order sentencing Smith to die. The court found that aggravating circumstances justifying a death penalty existed under Mont.Code Ann. § 46–18–303, and that there were no mitigating circumstances "sufficiently substantial to call for leniency".

The Montana Supreme Court affirmed the sentence, *State v. Smith*, 217 Mont. 461, 705 P.2d 1087 (1985), *petition for rehearing denied*, 217 Mont. 453, 705 P.2d 1110 (1985). A writ of certiorari to the U.S. Supreme Court was denied, *Smith v. Montana*, 474 U.S. 1073, 106 S.Ct. 837, 88 L.Ed.2d 808 (1986), as was post-conviction relief in the Montana Supreme Court. Smith then filed for federal habeas relief, which was denied on summary judgment. He now timely appeals from the district court.

II.

A.

Smith asserts that his sentencing violated due process because he was denied expert psychiatric assistance in preparing his claims of mitigating circumstances. We agree.

Under *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), when an indigent defendant places his mental state at issue, "the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83, 105 S.Ct. at 1096. This right applies not only at trial, but also in "the sentencing phase:"

> "We have repeatedly recognized the defendant's compelling interest in fair adjudication at the sentencing phase of a capital case. The State, too, has a profound interest in assuring that its ultimate sanction is not erroneously imposed, and we do not see why monetary considerations should be more persuasive in this context than at trial.
>
> . . . .
>
> [W]here the consequence of error is so great, the relevance of responsive psychiatric testimony so evident, and the burden on the State so slim, due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, *and to assistance in preparation at the sentencing phase.*"

*Id.* at 83–84, 105 S.Ct. at 1096–97 (emphasis added).

■ The right to psychiatric assistance does not mean the right to place the report of a "neutral" psychiatrist before the court; rather it means the right to use the services of a psychiatrist in whatever capacity defense counsel deems appropriate—including to decide, with the psychiatrist's assistance, not to present to the court particular claims of mental impairment. As the 7th Circuit observed, under *Ake,*

> The independent psychiatric expert performs three functions which may be crucial in cases where mental health is a substantial issue. First, the expert can aid a defendant in determining whether a defense based on mental condition is warranted by the defendant's particular circumstances. Second, the expert can coherently present to the jury his or her observations of the defendant, as well as

his or her understanding of the defendant's mental history, and explain to the jury how those observations and that history are relevant to the defendant's mental condition. Finally, the expert can "assist in preparing the cross-examination" of psychiatric experts retained by the government.

*United States v. Fazzini,* 871 F.2d 635, 637 (7th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989) (citations omitted).

■ Consistent with the adversarial nature of the fact-finding process and the quasi-scientific nature of psychiatric opinion, the *Ake* court explicitly rejected the notion that psychiatrists can be expected to reach a unanimous diagnosis of the current mental condition of a defendant and unanimous prognosis as to future expected conduct or that there is such a thing as "neutral" psychiatric testimony:

> Psychiatry is not ... an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness. Perhaps because there often is no single, accurate psychiatric conclusion on legal insanity in a given case, juries remain the primary factfinders on this issue, and they must resolve differences in opinion within the psychiatric profession on the basis of the evidence offered by each party.

470 U.S. at 81, 105 S.Ct. at 1095.

In the case before us, the indigent defendant Smith requested a court-appointed psychiatrist to help establish possible mitigating circumstances. The trial court agreed that psychiatric evaluation was appropriate. However, rather than appointing an expert to assist Smith in preparation for a resentencing hearing, the trial judge ordered an evaluation for the court, which would be reported directly to the court:

On June 10, 1983, the court granted the defendant's motion for psychiatric evaluation. The court appointed a psychiatrist, Dr. William Stratford, to examine the defendant and report to the court as to: (1) whether he could determine which of the versions given by the defendant was credible; and (2) what was the defendant's mental condition on August 4, 1982.

*State v. Smith,* 217 Mont. 461, 705 P.2d 1087, 1090 (1985). The psychiatrist's contact with Smith was limited to the court-ordered examination. Smith's counsel never met with the psychiatrist to discuss the evaluation or to otherwise assess possible mitigating circumstances.

In deciding to impose the death sentence, the Montana courts relied heavily on the psychiatric report to discount other testimony that Smith's behavior changed dramatically after he used LSD and alcohol. For example, Andre Fontaine, who was with Smith on the day of the murder and on the days immediately before the murder, gave the following testimony:

Q: How was Smith reacting after he took the three hits of acid? Was it affecting him to such a degree that you could observe a change?

A: Oh yeah.

Q: You could?

A: Oh yeah.

. . . .

Q: And he got pretty goofy when he took the acid?

A: Yeah, kind of crazy.

. . . .

Q: Now, when Smith testified in February after he had pled guilty to killing those two boys he was asked whether he was intoxicated that day or drunk and he said no that he knew what he was doing. Would that be—would you agree with that?

A: No.

Q: You think he had been drinking?

A: Yes.

Q: Or was intoxicated?

A: I think he had enough to know that he didn't know what he was doing.

Q: You don't think he knew what he was doing?

A: I'm sure he didn't know.

But the Montana Supreme Court, on automatic review of the death penalty, wrote:

Dr. Stratford testified that he assumed that the defendant had ingested "eight or nine hits" of LSD the day before the crimes and consumed "at least ten or twelve beers" on the day of the crimes.... [T]he testimony of Dr. Stratford clearly reveals that the defendant had been using a "substantial amount" of LSD "almost on a daily basis" during the month before the crimes. According to Dr. Stratford, continued use of LSD quickly gives rise to a tolerance which requires larger and larger doses to produce significant effects. Therefore, the defendant's repeated use of LSD would cause significant doses to have little effect.... Dr. Stratford's testimony ... removes any force from the defendant's argument.

705 P.2d 1087, 1102.

Clearly the court-appointed psychiatrist's testimony was quite important in the decision to discount Smith's claims of diminished capacity.

The Montana courts held that evaluation by a "neutral" psychiatrist satisfied Smith's right to psychiatric assistance, even though the psychiatrist in no sense assisted in evaluation or preparation of the defense, and even though the defense was afforded no opportunity to rebut with its own psychiatric witness a highly damaging report prepared for the court. As Montana Justice Harrison stated, "The record demonstrates that Dr. Stratford was a neutral psychiatrist who examined Smith as to his sanity at the time of the offenses. Dr. Stratford testified to the foregoing at the hearing and it was on that basis that this Court found no additional psychiatric evaluation was necessary." *State v. Smith,* 217 Mont. 453, 705 P.2d 1110, 1114 (1985).

But under *Ake,* evaluation by a "neutral" court psychiatrist does not satisfy due pro-

cess. As then Circuit Judge Scalia stated in *United States v. Byers*, 740 F.2d 1104 (D.C.Cir.1984),

> Appellant and *amici* would have us believe that the mere availability of cross-examination of ... [psychiatric] experts is sufficient to provide the necessary balance in the criminal process. That would perhaps be so if psychiatry were as exact a science as physics, so that, assuming the ... psychiatrist precisely described the data ..., the error of his analysis could be demonstrated. It is, however, far from that. Ordinarily the only effective rebuttal of psychiatric opinion testimony is contradictory opinion testimony ...

740 F.2d at 1114.

Smith was entitled to his own competent psychiatric expert. *See also U.S. v. Chavis*, 486 F.2d 1290, 1292 (D.C.Cir.1973) ("Two, three, or four psychiatrists for the Government and the court do not constitute adequate expert assistance for the defense"); *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir.1985) (state's duty "cannot be satisfied with the appointment of an expert who ultimately testifies contrary to the defense on the issue of competence"); *Marshall v. United States*, 423 F.2d 1315, 1319 (10th Cir.1970) (expert who shares "a duty to the accused and a duty to the public interest" is burdened by "an inescapable conflict of interest").

The limitations on as well as the indigent's right to psychiatric assistance are explicitly stated in *Ake:* The indigent is entitled "to provision of *one competent* psychiatrist," 470 U.S. at 79, 105 S.Ct. at 1094 (emphasis added); but he is not entitled "to choose a psychiatrist of his personal liking or to receive funds to hire his own," *id.* at 83, 105 S.Ct. at 1096.

These limitations underscore the logical necessity of allowing the indigent's counsel to confer with the state-appointed psychiatrist before deciding whether, or how, to place the results of psychiatric evaluation before a fact-finder. If the only psychiatrist provided makes an evaluation which is damaging for a particular defense, an indigent, unlike a wealthy defendant, lacks the financial capacity to retain other psychiatrists. Competent counsel would want to refrain from introducing harmful testimony to the factfinder, but could still ask the court-appointed psychiatrist to consider other lines of analysis and to help prepare other forms of defense. Counsel might restrict the use of the psychiatrist to assistance in refuting other evidence bearing on mental capacity; or might choose not to present testimony on certain forms of mental impairment at all. None of these options was available to Smith since the court gave explicit directions limiting the scope of his psychiatric evaluation, and since the report was forwarded directly to the court.

We further note that since defense counsel cannot predict the outcome of a psychiatric evaluation, to grant court-appointed psychiatric assistance only on condition of automatic full disclosure to the fact finder impermissibly compromises presentation of an effective defense, by depriving him of " 'an adequate opportunity to present [his] claims fairly within the adversary system.' " 470 U.S. at 77, 105 S.Ct. at 1093 (quoting *Ross v. Moffitt*, 417 U.S. 600, 612, 94 S.Ct. 2437, 2444–45, 41 L.Ed.2d 341 (1974)). Competent psychiatric assistance in preparing the defense is a "basic tool" that must be provided to the defense. *Id.* To impose such a condition as full disclosure takes away the efficacy of the tool. The Third Circuit addressed this problem squarely in *United States v. Alvarez*, 519 F.2d 1036, 1045–47 (3d Cir.1975):

> *United States v. Kovel*, 296 F.2d 918 (2d Cir.1961) holds that communications to an accountant, in confidence, for the purpose of obtaining legal advice from a lawyer are protected by the attorney-client privilege.... We see no distinction between the need of defense counsel for expert assistance in accounting matters and the same need in matters of psychiatry. The effective assistance of counsel with respect to the preparation of an insanity defense demands recognition that a defendant be as free to communicate with a psychiatric expert as with the attorney he is assisting.
>
> ....

... The issue here is whether a defense counsel in a case involving a potential defense of insanity must run the risk that a psychiatric expert whom he hires to advise him with respect to the defendant's mental condition may be forced to be an involuntary government witness. The effect of such a rule would, we think, have the inevitable effect of depriving defendants of the effective assistance of counsel in such cases. A psychiatrist will of necessity make inquiry about the facts surrounding the alleged crime, just as the attorney will. Disclosures made to the attorney cannot be used to furnish proof in the government's case. Disclosures made to the attorney's expert should be equally unavailable, at least until he is placed on the witness stand. The attorney must be free to make an informed judgment with respect to the best course for the defense without the inhibition of creating a potential government witness.

... Thus we reject the contention that the assertion of insanity at the time of the offense waives the attorney-client privilege with respect to psychiatric consultations made in preparation for trial.

We agree with the Third Circuit that a defendant's communication with her psychiatrist is protected up to the point of testimonial use of that communication. *See also United States v. Nobles*, 422 U.S. 225, 240 n. 15, 95 S.Ct. 2160, 2171 n. 15, 45 L.Ed.2d 141 (1975) (order to disclose defense investigator's report "resulted from [defendant's] voluntary election to make testimonial use of [the] report"); *United States v. Talley*, 790 F.2d 1468, 1470–71 (9th Cir.1986) (recognizing "attorney-psychotherapist-client privilege" based in common law); *United States Ex rel. Edney v. Smith*, 425 F.Supp. 1038, 1054–55 (E.D.N.Y.1976), (defendant waived protection against prosecution's use in rebuttal of one-time defense expert when defendant introduced testimony on mental state from different expert), *aff'd,* 556 F.2d 556 (2d Cir.), *cert. denied,* 431 U.S. 958, 97 S.Ct. 2683, 53 L.Ed.2d 276 (1977). Confidentiality must apply not only to psychiatric assistance at trial, but also to such assistance for sentencing in capital cases. In the case before us, even if Dr. Stratford had been acting as a defense psychiatrist, and had reached the same conclusion of no diminished capacity on the day of the crime, Smith's counsel was entitled to a confidential assessment of such an evaluation, and the strategic opportunity to pursue other, more favorable, arguments for mitigation. But Dr. Stratford's examination was restricted to a narrow field of inquiry prepared not for defense counsel, but for the court. As such, the process of psychiatric evaluation was inadequate.

### B.

The dissent asserts that Smith's request for "adversarial" psychiatric assistance was "not properly requested." Because this assertion is contrary to the record, we feel compelled to cite from the record Smith's repeated objections and requests for his own psychiatrist. At issue here is not the question of whether "there are times when *one* is entitled to a psychiatrist" (emphasis added), as the dissent comments, but rather the right of *indigents* to the same adversarial psychiatric assistance that wealthy persons retain. Disgust over the heinousness of a particular crime or an interest in streamlining capital sentencing does not entitle us to lower the constitutional standards for indigents' defense.

On April 11, 1983, Smith made his first request for psychiatric assistance. The Montana District Court appointed a psychiatrist with limited instructions to investigate Smith's mental condition and to provide the report to the court.

The dissent states that "[t]he defendant objected to certain parts of the order; he did not object to the fact that the report might be available to the court itself." In fact, the defendant's timely objection, dated June 20, 1983, read as follows:

2. The Defendant should have the same access to required expert testimony and assistance that would be available to him if he were not indigent. The Defendant's Motion [for psychiatric assistance] was for the purpose of obtaining a pro-

fessional who would rely on the facts as indicated by the Defendant in his examination and *be able to establish a doctor-patient relationship without a "feeling" that the doctor would be serving a dual role as an investigator.*
3. The Court's June 10, 1983 Order, paragraph 1, page 3, requires the doctor to examine the conflicts in the Defendant's testimony, and essentially conduct an investigation into the basis of those facts, *and report to the Court his opinion based upon that investigation.* Such a requirement imposed upon the doctor destroys the relationship necessary to the doctor's examination and evaluation, is beyond the doctor's realm of expertise, constitutes an illegal and unconstitutional delegation of the Court's authority, and operates as an injustice to the Defendant....

(Emphasis added). The record is quite clear: the defendant explicitly objected precisely to both the nature of the psychiatric evaluation and to the report being directed to the court. The dissent's contrary claim is insupportable.

The second sentencing hearing, in which the psychiatrist testified, was held on December 1, 1984. Dr. Stratford's report had been forwarded to the court and government counsel, and subsequently made available to defense counsel. The report was highly damaging to Smith's claims of mitigation.

The dissent asserts that at this hearing "counsel expressed no objection to the fact that Smith did not have an independent adversarial psychiatrist. He did not ask the court to strike the report, or to refuse to consider it, or to order another report....Rather, he called the psychiatrist to the witness stand."

It is true that defense counsel called the psychiatrist to the witness stand, without *first* objecting at this hearing to the report. But defense counsel called Dr. Stratford to testify for the sole purpose of discrediting Dr. Stratford's report. Defense counsel specifically *did object* to Dr. Stratford's report at the end of that hearing, before any new sentencing, specifically preserving the right to file additional motions developing the objection. The court granted defense's request for time to file additional motions prior to sentencing. The dissent's portrayal that defense called Dr. Stratford to make the defendant's case, and then later objected after defense was displeased with the testimony is inaccurate. Here are some representative excerpts from the December 1, 1984, hearing:

Mr. Doran [defense counsel]: For the first witness your Honor I would call William Stratford, M.D. to the stand.

. . . .

Q[uestion]: In the Court's Order do you recall the Court requesting that essentially you investigate the discrepancies in the Defendant's testimony at earlier proceedings....
A[nswer]: That is correct.

. . . .

Q: Do you feel as a doctor that there is any inherent conflict in performing an investigative role for the Court on the one hand and performing an evaluation of the Defendant on the other hand?
A: Well, as you have worded that I don't see any particular conflict....

. . . .

Q: Is it true that you provided me with a written report, however it was forwarded to the Judge originally, is that correct?
A: That is correct Mr. Doran.

. . . .

Q: Well, what I'm driving at, Dr. Stratford, is isn't it very difficult for you to in one sphere of your mind assume the role of an investigator to inquire into the facts to make a determination—doesn't that in fact imply in your role that you have to be skeptical of what the version is from the different defendants and try to come to some conclusion as what may be truthful and yet in the other sphere assume that the defendant is telling you the truth as far as drug or alcoholic usage and come to an evaluation or medical conclusion in that regard. Isn't that an inherent conflict on your part?
A: It could be a conflict, yes.

.     .     .     .     .

Mr. Doran: I have no further witnesses your Honor. I feel your Honor that I need not make a lengthy closing statement in this case.... In regard to the doctor's testimony, *I may have further motions to make and in fact one may include a motion for additional psychiatric evaluation untainted by an investigative requirement* and I may have additional motions to make to the Court so I would ask the Court to grant me 10 days to consider any additional motions that I may desire to make in this case....

The Court: .... I have granted the Defendant until the 12th to submit in writing any additional motions that he may have in mind or which may later occur to him.... [A]ll I can say at this point is we will see what the motions are, what relief is requested by any such motions and how long preparation of the transcript may require and then I will set forth additional deadlines thereafter for written argument from counsel.

(Emphasis added).

In accordance with the court's process, the defendant timely filed, on December 12, 1983, an additional motion repeating the prior request for a defense psychiatrist. It is hardly true that this motion did no more than request a new examination "in the place and stead" of Dr. Stratford's, as the dissent states. The motion restated the June 20, 1983 objections:

2. To introduce the elements of suspicion, impose investigative duties, and otherwise interfere with the doctor-patient relationship creates an inherent conflict on the part of Dr. Stratford....

.    .    .    .    .

The doctor should have directed his findings towards any mitigating factor whatsoever related to the Defendant's drug or alcohol usage prior to the incident and any effect such usage could have had upon the Defendant's perceptions or state of mind.

Counsel for the Defendant is in the process of identifying an appropriate professional with a degree of specialization and expertise in the use and effects of hallucinogenic drugs such as used by the Defendant and who, unfettered by investigative duties, could present a more informed and unbiased opinion as to the Defendant's state of mind at the time of the incident....

That the dissent could characterize this record as indicating that Smith "did not effectively object" to the psychiatric evaluation process is puzzling.

The dissent states that Smith "failed to raise [the personal psychiatrist] issue when he first appealed to the Montana Supreme Court." Yet in *State v. Smith,* 217 Mont. 461, 705 P.2d 1087, 1100–01 (1985), the Montana Supreme Court noted, "The defendant argues when the court requested the additional [psychiatric] investigation, Dr. Stratford's role changed and he became an agent for the State." Even were we somehow to agree that the issue was not properly raised in the first appeal to the Montana Supreme Court, that court agreed to hear Smith's *Ake* claims after the *Ake* decision issued in 1985. *State v. Smith,* 217 Mont. 453, 705 P.2d 1110 (1985). Since the Montana Supreme Court heard and decided the issue, there is obviously no question of state procedural bar to this claim. The federal district court did not assert that Smith's *Ake* claim was procedurally barred; rather it "agree[d] with the Montana Supreme Court's conclusion that a second psychiatric evaluation was not required." The district court did believe that one aspect of the defendant's psychiatric assistance claim—the objection to the forwarding of the report directly to the trial court— had not been raised in the state courts and was barred. As we have shown in our review of the record, however, this observation was in error, for Smith did so object. Again, even if Smith had not so objected, the principal basis of the *Ake* claim would still remain: he was not provided a psychiatric expert charged with assisting him in his defense. On this basis alone Smith is entitled to a new sentencing hearing.

The dissent acknowledges that Smith, an indigent capital defendant, requested psychiatric assistance to prepare claims of mitigation. The dissent's position is that it is

permissible for the state to respond to such a request by providing a "neutral" or "state" psychiatric examination, even when the psychiatrist submits reports or testimony against the defendant's interests. "Fundamentally," states the dissent, "there is no absolute right to an adversarial psychiatrist at sentencing." But here the dissent is simply repeating the lone dissent to *Ake:*

> [E]ven if I were to agree with the Court that some right to a state-appointed psychiatrist should be recognized here, I would not grant the broad right to "access to a competent psychiatrist who will conduct an appropriate examination *and assist in evaluation, preparation, and presentation of the defense." Ante,* at 83 [105 S.Ct. at 1096] (emphasis added). A psychiatrist is not an attorney, whose job it is to advocate. His opinion is sought on a question that the State of Oklahoma treats as a question of *fact.* Since any "unfairness" in these cases would arise from the fact that the only competent witnesses on the question are being hired by the State, all the defendant should be entitled to is one competent opinion—whatever the witness' conclusion—from a psychiatrist who acts independently of the prosecutor's office. Although the independent psychiatrist should be available to answer defense counsel's questions prior to trial, and to testify if called, I see no reason why the defendant should be entitled to an opposing view, or to a "defense" advocate.

*Ake v. Oklahoma,* 470 U.S. 68, 92, 105 S.Ct. 1087, 1101, 84 L.Ed.2d 53 (Rehnquist, J., dissenting). This view is not the law. As a circuit court, we are obliged to apply the rule of *Ake,* rather than the position expressed in *Ake*'s dissent. Even if we were to agree with the dissent that the *Ake* right should be read more narrowly, in the case before us the Montana court responded to Smith's claims of mental impairment by ordering a psychiatric report presented to the court eviscerating Smith's arguments of mitigation. Smith was entitled not simply to cross-examine the court psychiatrist, but to present "responsive psychiatric testimony," 470 U.S. at 84, 105 S.Ct.

at 1096–97, which he timely requested, but was denied.

### C.

Smith also argues that consideration of Dr. Stratford's testimony, as well as use of information from a presentence report, violated his 5th Amendment rights under *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Because we find, under *Ake,* that Smith is entitled to a new court-appointed psychiatric expert to assist in defense preparations for a new sentencing hearing, we do not reach the 5th Amendment claims.

### III.

Smith asserts that the Montana courts refused to consider or give effect to relevant mitigating evidence in its decision to impose the death sentence. We agree.

### A.

The Montana death penalty statute reads, in relevant part,

> In determining whether to impose a sentence of death or imprisonment, the court shall take into account the aggravating and mitigating circumstances ... and shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency.

Mont.Code Ann. § 46–18–305 (1989). The statute also defines mitigating circumstances:

> (1) The defendant has no significant history of prior criminal activity.
> (2) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
> (3) The defendant acted under extreme duress or under the substantial domination of another person.
> (4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(5) The victim was a participant in the defendant's conduct or consented to the act.

(6) The defendant was an accomplice in an offense committed by another person, and his participation was relatively minor.

(7) The defendant, at the time of the commission of the crime, was less than 18 years of age.

(8) Any other fact that exists in mitigation of the penalty.

Mont.Code Ann. § 46–18–304 (1989).

Under the Montana structure, if any of a list of aggravating factors is present, death is presumed to be the appropriate penalty, unless there are mitigating circumstances "sufficiently substantial" to justify a sentence less than death. If a capital defendant brings forward evidence of any of the first seven enumerated mitigating factors, the Montana court must consider and weigh the factors to determine if leniency is appropriate. If some other mitigating factor, not among the seven, or which does not meet the qualitative standard announced (e.g., an emotional disturbance less than "extreme" or diminished capacity less than "substantial") is brought forward, the catchall subsection (8) appears to permit the consideration of such other factors.

### B.

In his second resentencing hearing, Smith brought forward 5 mitigating factors: (1) he suffered diminished mental capacity due to use of LSD; (2) he suffered diminished capacity due to alcohol consumption; (3) his criminal record showed no violent activity; (4) he had eleven character references attesting that violent behavior was out of character; (5) he admitted guilt, was contrite, and was committed to rehabilitation. These factors were all clearly relevant as mitigating evidence. *Sumner v. Shuman,* 483 U.S. 66, 73–76, 107 S.Ct. 2716, 2721–23, 97 L.Ed.2d 56 (1987); *Roberts (Harry) v. Louisiana,* 431 U.S. 633, 637, 97 S.Ct. 1993, 1995, 52 L.Ed.2d 637 (1977); *Woodson v. North Carolina,* 428 U.S. 280, 303–04, 96 S.Ct.

2978, 2990–91, 49 L.Ed.2d 944 (1976) (plurality opinion). Three of these claims were covered by listed subsections of the Montana statutory scheme. His claims of diminished capacity due to drugs and alcohol invoked subsection (4) ("capacity ... substantially impaired") and subsection (2) ("extreme mental or emotional disturbance"); his claims regarding his criminal record invoked subsection (1) ("no significant history of prior criminal activity"). Two of his claims were not listed, but should have been considered under subsection (8) ("any other fact that exists in mitigation"): his character references and his desire for rehabilitation.

Two constitutional defects emerged in the Montana courts' weighing of these claims of mitigation. First, with regard to those claims of mitigation not specifically listed in the statute, but covered by the "catchall" subsection (8), the Montana courts refused to consider Smith's evidence as mitigating factors at all. The term "sufficiently substantial" was used not to describe the process of weighing mitigating factors, but rather as a qualifier which excluded from consideration as a mitigating factor evidence which "did not *excuse* the defendant's conduct." *See McKoy v. North Carolina,* —— U.S. ——, 110 S.Ct. 1227, 1223, 108 L.Ed.2d 369 (1990) (citing *Eddings v. Oklahoma,* 455 U.S. 104, 113–16, 102 S.Ct. 869, 876–78, 71 L.Ed.2d 1 (1982)) (emphasis in original).

Second, in evaluating those claims which invoked factors specifically listed under the Montana statute, both the trial court and the Montana Supreme Court analyzed each claim of mitigation discretely, to determine if that factor alone was sufficiently substantial to warrant leniency. The Montana courts failed to weigh Smith's claims as a whole, to determine if "the circumstances of the offense *together with* the character and propensities of the offender", *Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, 55, 58 S.Ct. 59, 61, 82 L.Ed. 43 (1937) (emphasis added), were sufficient to call for leniency.

The Supreme Court in *Walton v. Arizona,* —— U.S. ——, 110 S.Ct. 3047, 111

L.Ed.2d 511 (1990), recently found the "sufficiently substantial to call for leniency" standard in Arizona's death penalty statute constitutional with regard to the burden of persuasion in capital sentencing. *Id.* at ——, 110 S.Ct. at 3053–55. However, that holding in *Walton* is not relevant to our analysis in this section nor to part IV of this opinion. The defendant in *Walton* did not "complain[ ] that the Arizona statute or practice excludes from consideration any particular type of mitigating evidence", which, as the court noted, would have made out a claim under *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 ("It is true that the Court has refused to countenance state-imposed restrictions on what mitigating circumstances may be considered in deciding whether to impose the death penalty." *Id.*). It is precisely the exclusion from consideration of relevant mitigating evidence that Smith alleges and which we consider below.

### C.

We examine first the Montana courts' treatment of Smith's character evidence and his desire for rehabilitation.

■ After the March 1983 sentencing hearing, in which Smith sought the death penalty and stated that he had no excuse nor remorse for the killings, the trial court listed as part of its basis for applying the death penalty its view that "[t]he Defendant has and demonstrates no respect for human life, including, apparently, his own"; that "[t]he Defendant expresses and apparently feels *no sorrow or remorse* for the offenses committed by him or the loss of innocent lives which he planned and caused"; and that "[t]he possibilities that the Defendant may be rehabilitated upon incarceration ... are essentially non-existent." Record on Appeal at Appendix 1–4. In the subsequent rehearings, Smith presented numerous character witnesses and letters and gave extensive testimony about his own change of perspective from the time he sought the death penalty. Yet the trial court held that such evidence was "peripheral and extraneous ... and *must not be brought to bear* upon the Court's

determination of a just and necessary punishment." Record on Appeal at Appendix 7–3 (emphasis added). To declare that such evidence "must not be brought to bear" on a determination of punishment directly violates the constitutional requirements announced in *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978) (plurality opinion), that the sentencer must consider "any aspect of a defendant's character or record", and in *Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982), that sentencers may not give relevant mitigating evidence "no weight by excluding such evidence from their consideration." *See also Saffle v. Parks,* —— U.S. ——, 110 S.Ct. 1257, 1261, 108 L.Ed.2d 415 (1990). Yet the Montana Supreme Court agreed with the trial court, summarily dismissing "the defendant's intention to seek rehabilitation ... as self-serving." 705 P.2d at 1098.

Smith also presented two character witnesses and submitted eleven character letters of reference to support his assertion that the murders were out of character and would not have occurred but for diminished capacity, and to support the credibility of his desire for rehabilitation. In their findings, neither the trial court nor the Montana Supreme Court made any reference at all to this character evidence. On this record, we cannot find that the Montana Supreme Court considered the mitigating evidence submitted under the catchall subsection (8).

The Montana courts were entitled to conclude that the mitigating evidence Smith submitted under the catchall subsection (8) was not persuasive enough to grant a sentence less than death; but they were not entitled to refuse to consider it as mitigating evidence simply because it fell below a certain weight. The sentencer must "consider and give effect to all relevant mitigating evidence offered by petitioner." *Boyde v. California,* —— U.S. ——, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990); *see also Penry v. Lynaugh,* —— U.S. ——, 109 S.Ct. 2934, 2946, 106 L.Ed.2d 256 (1989); *Hitchcock v. Dugger,* 481 U.S. 393, 398–99, 107 S.Ct. 1821, 1824–25, 95 L.Ed.2d 347 (1987).

Failure even to discuss Smith's character evidence also violates the Montana statute and renders the findings in this case incomplete. Under Mont.Code Ann. § 46–18–306, Montana courts are required to present "written findings of fact ... substantiated by the records of the trial and the sentencing proceeding" on their determinations of aggravating and mitigating factors. An incomplete record in capital sentencing is constitutionally inadequate: there must be "full disclosure of the basis for the death sentence," *Gardner v. Florida*, 430 U.S. 349, 361, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1977) (plurality opinion), so that capital sentencing is "rationally reviewable." *Woodson v. North Carolina*, 428 U.S. 280, 303, 96 S.Ct. 2978, 2990–91, 49 L.Ed.2d 944 (1976); *Spaziano v. Florida*, 468 U.S. 447, 462, 104 S.Ct. 3154, 3163, 82 L.Ed.2d 340 (1984). We are not permitted to presume that because evidence was admitted before the factfinder, it was necessarily given consideration. *Eddings v. Oklahoma*, 455 U.S. 104, 113, 102 S.Ct. 869, 876, 71 L.Ed.2d 1 (1982); *Penry v. Lynaugh*, — U.S. —, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989). For, as Justice O'Connor noted in *Eddings*, "we may not speculate as to whether the trial judge and the Court of Criminal Appeals actually considered all of the mitigating factors and found them insufficient to offset the aggravating circumstances, or whether the difference between this Court's opinion and the trial court's treatment of the petitioner's evidence is 'purely a matter of semantics' ... *Woodson* and *Lockett* require us to remove any legitimate basis for finding ambiguity concerning the factors actually considered by the trial court." 455 U.S. at 119, 102 S.Ct. at 879 (O'Connor, J., concurring). The sentencing court must therefore explicitly discuss in its written findings all relevant mitigating circumstances, "including those it finds insufficient to warrant leniency." *See Coleman v. Risley*, 839 F.2d 434, 502 (9th Cir.1988) (Reinhardt, J., dissenting), *rev'd sub nom. Coleman v. McCormick*, 874 F.2d 1280 (en banc) (9th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989).

### D.

We next address the Montana courts' consideration of that evidence which invoked mitigating factors listed under the Montana statute.

■ In its discussion of Smith's claims of mental impairment, the Montana Supreme court quoted and relied on the findings of the trial court. *State v. Smith*, 705 P.2d at 1098. The trial court had dismissed mental impairment as a mitigating factor, for the following reason:

> That the defendant voluntarily and unhesitatingly ingested substantial quantities of alcohol on the day these crimes were committed, and numerous tablets or "hits" of LSD in the days prior thereto, does not relieve him of responsibility for his actions. They are no less reprehensible for these reasons; his victims will remain dead for as long, and their friends and families will grieve as deeply and inconsolably, as if the Defendant had consumed neither alcohol nor drugs ... As the court specifically found in March of 1983 'none of the offenses were committed while the defendant was under the influence of a mental or emotional disturbance but they were in fact calculated by him in advance and carried out in a cold and detached fashion while the defendant was entirely aware of the circumstances and his actions ...'

Record on Appeal at Appendix 7–(3–4).

It is striking that this final trial court conclusion quotes from its opinion following the original March 1983 sentencing hearing—a hearing at which no evidence of mitigation whatsoever was presented, and in which the defendant, in his pursuit of the death penalty, affirmatively denied the existence of any mitigating factors. The mitigating evidence presented in the subsequent rehearings should have entered into the trial court's consideration. The court-appointed psychiatric expert, Dr. Stratford, for example, did not himself testify that Smith suffered "no" mental impairment or disturbance; rather in his opinion any impairment was not "substantial" or "extreme" enough to satisfy the Montana

standards for mitigation. The following colloquies from Dr. Stratford's testimony are illustrative:

Q[uestion]  In Judge Keedy's order ... Judge Keedy indicates that there are certain mitigating factors that are enumerated by statute ... and that includes the influence of extreme mental or emotional disturbance or that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. In the report that I reviewed prepared by you, you refer to these sections ... Did you assume that your report was to be prepared within these legal guidelines?

A[nswer]  My report was to be prepared being fully cognizant of the nature of the conclusions of law in the order and I tried to respond in language which would indicate that I am familiar with these terms and I understand what these terms mean based on my professional practice

. . .

Q  Did you believe or take the position in comparing your conclusions that the mitigating factors could be anything, anything that could not be tied to deliberate criminal intent ...?

A  That's my understanding that I was to look for extreme mental or emotional disturbances and so on.

. . .

Q  Okay, assuming that Mr. Smith had taken LSD for a considerable number of years but specifically on a daily basis and for a month prior to the crime may have taken as much as 50 hits of LSD a day prior to this crime, may have drank as many as 12 beers on the day of the crime, what is your conclusion as to any mental effects of these drugs and whether in fact his ability to perceive reality and to act in a proper way may have been [a]ffected?

A  My opinion given the question that the history of the drug ingestion and the degree of acquisition of tolerance to the hallucinogens as I had, namely LSD and the degree of tolerance to alcohol which is characterized by a long and colorful drug history did not materially affect his state of mind at the point in time that we are considering.

Q  When you say materially, why do you use that word?

A  I would have used other words, substantially. I used different kinds of language in the report. In my opinion, in my report the drug effect was extremely minimal if present at all.

Q  Does you[r] conclusion[ ] assume that to have a mitigating—to become a mitigating factor that there has to be some substantial or material effect caused by the drug?

A  Well, essentially in my understanding of it that that decision is up to the Judge but quantitatively I would think a reasonable person would assume that it would have to be substantial.

. . .

Q  To say that there was no substantial effect is not to say that there was no effect?

A  Well, I can't say that there was none

. . .

Transcript on Appeal at 304–05; 320–21; 339.

The Montana Supreme Court followed the trial court's analysis, concluding that "there was substantial evidence to support the District Court's *rejection* of intoxication as a mitigating circumstance." 705 P.2d at 1098 (emphasis added). Because the evidence of mental impairment did not rise to the statutory level of "extreme" or "substantial", the evidence was "rejected" as a mitigating circumstance, rather than considered, as a mitigating circumstance of lesser weight, along with other factors.

The failure to weigh together mitigating circumstances which individually may not warrant leniency was also reflected in the Supreme Court's treatment of Smith's record. The court stated shortly, "against the record of this brutal crime, we cannot say that the defendant's lack of prior violent criminal activity is a factor sufficiently substantial to call for leniency." *Id.* at 1097. The consideration ends there, showing that the court believed that since Smith's criminal record by itself did not

require a sentence less than death, the record need not be considered in combination with other mitigating evidence. Yet Smith's claims that he had no history of violent behavior and that his mental capacity was affected by drugs and alcohol are mutually reinforcing, and carry a different weight together than if assessed separately.

The Supreme Court summarized its analysis by saying, "we hold the District Court was correct in its conclusion that 'no mitigating *circumstance was* sufficiently substantial to call for leniency.'" 705 P.2d at 1098 (emphasis added). The use of the singular form again reflects that each individual mitigating factor was weighed by itself against the totality of the aggravating factors.

Our capital sentencing jurisprudence makes clear that even if Smith's record or mental impairment are not in themselves cause for a sentence less than death, they are still relevant to mitigation and must be weighed in conjunction with other factors to determine if all of the circumstances together warrant a lesser sentence.

This Court has previously recognized that "[f]or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, 55 [58 S.Ct. 59, 61, 82 L.Ed. 43] (1937). Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. See *Williams v. New York,* 337 U.S. [241], at 247–249 [69 S.Ct. 1079, at 1083–84, 93 L.Ed. 1337]; *Furman v. Georgia,* 408 U.S. [238], at 402–03 [92 S.Ct. 2726, 2810–11, 33 L.Ed.2d 346] (Burger, C.J., dissenting). While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for

humanity underlying the Eighth Amendment, see *Trop v. Dulles,* 356 U.S. [86], at 100 [78 S.Ct. 590, 597–98, 2 L.Ed.2d 630] (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

*Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion).

As Justice O'Connor wrote in *Penry v. Lynaugh,* —— U.S. ——, 109 S.Ct. 2934, 2951, 106 L.Ed.2d 256 (1989), "[r]ather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a 'reasoned *moral* response to the defendant's background, character, and crime.'" (citations omitted; emphasis in original). Justice O'Connor's use of the conjunctive—that the moral analysis in death sentencing must respond to "the defendant's background, character, *and* crime", follows *Woodson's* position that all mitigating evidence must be weighed "together".

The sentencer must not only consider, but "give effect" to all the mitigating evidence. *Penry,* 109 S.Ct. at 2947. But the Montana Supreme Court "rejected" as mitigating that evidence not sufficiently substantial to warrant leniency, and deprived such evidence of any effect by failing to weigh it together with other circumstances.

Simply to run down a list of possible mitigating factors seriatim, deciding whether each one meets a threshold weight, fails to focus sentencing on the appropriateness of death for a specific individual. Failure to assess defendants as "uniquely individual human beings", *Woodson,* 428 U.S. at 304, 96 S.Ct. at 2991, in light of the combined moral weight of all the mitigating evidence, is to unconstitutionally "narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence." *McCleskey v. Kemp,* 481 U.S. 279, 304, 107 S.Ct. 1756, 1773, 95 L.Ed.2d 262 (1987) (emphasis in

original). *Compare United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989) (applying totality of circumstances analysis to drug profile searches).

Although the Supreme Court has recently held that *Lockett* and *Eddings* speak mainly to "what" mitigating evidence a sentencer must consider rather than "how" that evidence must be considered, *Saffle v. Parks,* —— U.S. ——, 110 S.Ct. 1257, 1261, 108 L.Ed.2d 415 (1990), it is clear from *Pennsylvania v. Ashe, Woodson,* and their progeny, that a sentencer, in addition to not excluding from consideration any relevant mitigating evidence, must also weigh all of the mitigating circumstances "together". The Montana courts failed to do this in Smith's case.

## IV.

In 1977, Montana revised its death penalty statute in an attempt to eliminate mandatory sentencing. A review of Montana Supreme Court decisions in death penalty cases since 1977 indicates that the inadequacies in the consideration of mitigating evidence apparent in Smith's case have been a consistent pattern since the adoption of the "sufficiently substantial to call for leniency" standard. The Montana Supreme Court has regularly failed to consider the totality of mitigating circumstances, instead weighing each individual mitigating factor alone against the full moral weight of the crime. And, the Court has failed to use the catchall subsection (8): in no death penalty case since 1977 has the Court given mitigating weight to an unenumerated mitigating circumstance.

In *State v. Lester Kills on Top,* 787 P.2d 336 (1990), *State v. Dawson,* 233 Mont. 345, 761 P.2d 352 (1988), *Coleman v. Risley,* 203 Mont. 237, 663 P.2d 1154 (1983), *McKenzie v. Osborne,* 195 Mont. 26, 640 P.2d 368 (1981), *State v. Fitzpatrick,* 186 Mont. 187, 606 P.2d 1343 (1980), *cert. denied,* 449 U.S. 891, 101 S.Ct. 252, 66 L.Ed.2d 118 (1980), and *State v. Coleman,* 185 Mont. 299, 605 P.2d 1000 (1979), there is no reference to any unenumerated mitigating factors. As Montana Supreme

Court Justice Shea has explained, this is because the phrase "sufficiently substantial to call for leniency" has been used by the Supreme Court to qualify, and restrict the "mitigating circumstances" it will consider. *State v. Fitzpatrick,* 606 P.2d at 1369 (Shea, J., dissenting). The Montana courts have repeated the error discussed in *Eddings,* viz., they "considered only that evidence to be mitigating which would tend to support a legal excuse from criminal liability." 455 U.S. at 113, 102 S.Ct. at 876.

The only post–1977 Montana case arguably to consider an unenumerated mitigating factor is *State v. Keith,* 231 Mont. 214, 754 P.2d 474 (1988). However, in *Keith,* the mitigating factors are discussed seriatim, with no reference to their cumulative weight nor consideration of whether the circumstances taken as a whole shed any different moral light on the appropriateness of the death penalty. *Id.* 754 P.2d at 484–486. The court did make reference to the defendant's claims of remorse and desire to reform himself, as well as to the defendant's "miscellaneous personal problems." *Id.* at 485–486. However, since the court did not consider the mitigating evidence as a whole, and, according to the court's view, no individual mitigating factor amounted to a legal excuse, this subsection (8) evidence was clearly given no weight in mitigation. The court concludes ritualistically that each circumstance is not "sufficiently substantial to call for leniency." *Id.*

We find that the "sufficiently substantial to call for leniency" standard as applied by the Montana Supreme Court has unconstitutionally limited the consideration of mitigating evidence. *Compare Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (sustaining "as applied" challenge to Georgia death penalty statute); *Penry,* 109 S.Ct. at 2945.

## V.

Smith asserts two other constitutional claims, relying on this circuit's opinion in *Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir.1988) (en banc): (1) Montana's "sufficiently substantial to call for leniency"

standard creates a "presumption of death" in capital sentencing, violative of the Eighth and Fourteenth Amendments; (2) Under the Sixth Amendment, a capital defendant is entitled to a jury hearing on the existence of aggravating circumstances. These arguments have been disapproved by the Supreme Court's plurality opinion in *Walton, supra.*

## VI.

■ In the proceedings below, Smith has repeatedly asserted ineffective assistance of counsel. Among Smith's allegations is that at the time of his change of plea from not guilty to guilty, his attorney failed to seek a psychiatric examination to determine his competence, and that the attorney's decision was based on a misunderstanding of the applicable legal standard for a competent guilty plea.

Treating the claims of ineffective assistance as colorable, the Montana Supreme Court ordered Smith's trial counsel to file a responsive declaration. The Court relied exclusively on this declaration to find that Smith's allegations were "without merit." Smith objected to the lack of an evidentiary hearing and renewed his claim before the U.S. District Court. That Court also summarily denied the claim.

"[W]here a petitioner raises a colorable claim of ineffective assistance, and where there has not been a state or federal hearing on this claim, we must remand to the district court for an evidentiary hearing." *Harich v. Wainwright,* 813 F.2d 1082, 1090 (11th Cir.1987). An ex parte submission of an affidavit by the trial counsel is procedurally inadequate; Smith is entitled to a full evidentiary hearing. *Jackson v. Estelle,* 570 F.2d 546, 547 (5th Cir.1978); *Woodcock v. McCauley,* 563 F.2d 806, 808–09 (7th Cir.1977). We remand to the district court for an evidentiary hearing on ineffective assistance of counsel.

■ Smith also seeks an evidentiary hearing to determine if the trial court relied on ex parte conferences between the court and the court psychiatrist and Smith's accomplices, Rodney Munro and Andre Fontaine, in determining sentencing.

However, unlike *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), where in applying the death penalty the court relied on a presentence report, part of which was kept from defense counsel, here the court and the psychiatrist clearly relied on Smith's own statements in applying sentencing. Further, defense counsel examined Munro, Fontaine, and Strickland and had ample opportunity to challenge, or otherwise deny or explain any aspect of their stories. We therefore find Smith's *Gardner* claim without merit.

### Conclusion

In Part II, we hold that Smith was denied due process by the failure of the court to appoint a defense psychiatrist to assist him in preparation for his sentencing hearing. We reverse the district court and remand with instructions to grant the writ of habeas corpus unless the State, within a reasonable time, appoints a defense psychiatrist and thereafter conducts a new sentencing hearing in accordance with the procedures set forth in this opinion.

In Parts III and IV, we hold that the "sufficiently substantial to call for leniency" standard, as applied in Montana, has resulted in an unconstitutional failure to consider and give effect to all relevant mitigating evidence; and that the Montana Supreme Court failed to provide a complete reviewable record discussing all relevant mitigating evidence. We reverse the district court and remand with instructions to grant the writ of habeas corpus unless the State, within a reasonable time, resentences Smith in accordance with the standards set forth in this opinion.

In Part V, we dismiss Smith's remaining constitutional objections to the Montana death penalty statute.

In Part VI, we hold that Smith is entitled to an evidentiary hearing solely on the question of ineffective assistance of counsel. We reverse the district court and remand with instructions to conduct the evidentiary hearing.

We REVERSE the district court and REMAND with instructions.

FERNANDEZ, Circuit Judge, concurring in part, and dissenting in part:

I respectfully dissent from the portion of the court's opinion set forth in Parts II, III and IV, although I concur in Parts V and VI.

Before turning to the merits of the claims, a few words should be said about the facts of the case.

As the majority notes, Smith, for no good reason whatever, killed two Native American men, who had befriended him and his companions. A part of the reason for these senseless killings was the theft of the victims' vehicle. More importantly, as Smith admitted at his first sentencing hearing, he killed them because he wanted to see what it would be like to kill someone. Beyond that, he informed the court that he was a violent person, that he felt no remorse, and that he could do it again. He also informed the court that he was not under the influence of drugs or intoxicants when he committed the crimes in question.

Based upon that record, the court sentenced him to death. Then Smith had second thoughts. He decided he was not so bad after all and could be rehabilitated. That resulted in the proceedings since then which have prolonged this matter from March of 1983 to this date, a common delay under our legal system's rather grudging approach to the disposition of death penalty cases. Our opinion today assures that it will be delayed even further. Some portions of that delay are necessary; other portions of it are not.

A. *Psychiatric Assistance.*

The majority asserts that Smith's constitutional rights have been violated because he was not given an independent adversarial psychiatrist at the hearing for reconsideration of his sentence, as opposed to a mere "neutral" psychiatrist. There can be little doubt that there are times when one is entitled to a psychiatrist, even at sentencing. *Ake v. Oklahoma,* 470 U.S. 68, 83–85, 105 S.Ct. 1087, 1096–97, 84 L.Ed.2d 53 (1985).

However, this is not a case where we should find that the lack of an adversarial psychiatric consultation results in overturning the sentence. It was not properly requested.[1]

### (1) The Request for a Psychiatric Examination.

On April 11, 1983, defendant asked for a psychiatric examination to ascertain whether he suffered from a mental disease or defect of a mitigating character. At a hearing on May 3, 1983, he presented argument to support that request, and the prosecutor said he did not really oppose it. The prosecutor went on to say that he could, perhaps, get Dr. William Stratford, the consulting psychiatrist at the state prison, to perform the examination, and Smith presented no objection to that. An order then issued which appointed Dr. Stratford to examine Smith and to make a report on his findings. Quite clearly, the intent of that order was that the report would be available to the court.

The defendant objected to certain parts of the order; he did not object to the fact that the report might be available to the court itself. The court amended its order in accordance with the objections.[2]

Thereafter, a second sentencing hearing took place. There, again, counsel expressed no objection to the fact that Smith did not have an independent adversarial psychiatrist. He did not ask the court to strike the report, or to refuse to consider it, or to order another report. Nor did he ask the court to recuse itself if it had already seen the report. Rather, he called the psychiatrist to the witness stand.

---

1. Since Smith did not properly request an adversarial psychiatrist, I do not reach the issue of whether he would have been entitled to one if he had requested one and had properly supported that request.

2. The amended order instructed Dr. Stratford to assume the truth of Smith's second set of statements regarding his use of drugs and alcohol. Dr. Stratford testified that he had done so, and on that basis was able to properly discharge his professional duties as a psychiatrist.

After Smith's new hearing, he requested a further psychiatric examination. In that request, he complained about the nature of Dr. Stratford's examination and the nature of the prior court order. He still did not complain that he had not been given a separate psychiatrist who would report only to him. All he requested was that a new examination be used "in the place and stead" of Dr. Stratford's. That request was denied, because, among other things, Smith had ample time before the second hearing to make that request and he did not do so. He was then sentenced to death a second time.

In short, Smith asked for the appointment of an examining psychiatrist, and it seems rather apparent that all concerned believed that Smith was asking for an evaluation that would be made available to court and counsel. Smith did not effectively object to that; all he really asked for was a second psychiatrist since he ultimately did not like the results of the first report. Nothing in our jurisprudence suggests that he is entitled to proceed in that manner.[3]

(2) Raising Issue Before State Courts.

As is apparent from the above, Smith did not actually raise the personal psychiatrist issue before the trial court. More than that, however, he also failed to raise that issue when he first appealed the case to the Montana Supreme Court. A review of the careful and detailed opinion of the Supreme Court of Montana reveals that. *State v. Smith*, 217 Mont. 461, 705 P.2d 1087 (1987). It outlines the thirteen issues that Smith raised on appeal—the claim of lack of a separate adversarial psychiatrist was not one of them. *Id.* 705 P.2d at 1091. There, again, Smith essentially objected to the evaluation itself, not to the fact that it was

not performed by his own adversarial psychiatrist.[4]

Thereafter, Smith did claim that *Ake v. Oklahoma* entitled him to a second psychiatric opinion. However, as the Montana Supreme Court pointed out, this case was very different from *Ake*. *State v. Smith*, 217 Mont. 453, 705 P.2d 1110 (1985); *see also Clisby v. Jones*, 907 F.2d 1047 (11th Cir.1990). This was not a case where a hapless defendant was forced to face the unwanted presentations of psychiatrists, without a means to defend against their devastating comments. *See also United States v. Sloan*, 776 F.2d 926 (10th Cir. 1985) (defendant repeatedly requested that the court provide him with a psychiatrist other than the doctor used by the prosecution). In this case, Smith asked for the psychiatrist and made no objection whatever to the fact that the psychiatrist's report was not solely for his own eyes.

What Smith asks for and what the majority grants is the overturning of his sentence for failure to give him an adversarial psychiatrist, even though he never requested one.[5] With the possible exception noted in Part VI of the majority opinion, this record shows no miscarriage of justice. On the contrary, Smith's guilt is manifest and the propriety of his sentence is equally so. *Cf. Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (petitioner could not raise constitutional claim on habeas corpus petition because he failed to raise it during state habeas proceedings); *see also Dugger v. Adams*, 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435, *reh'g denied*, —— U.S. ——, 109 S.Ct. 1770, 104 L.Ed.2d 205 (1989) (procedural default may bar petitioner from raising claim in federal habeas corpus proceedings). I cannot agree that we should overturn the sentence under these circumstances.

**3.** I do not say that Smith did not, in effect, attack the substance of Stratford's report. That issue was considered and properly decided by the Montana courts. That, also, is not the same as the demand for an adversarial psychiatrist, a demand which the majority now grants, and wrongly so.

**4.** That court did properly dispose of Smith's claim that use of the psychiatrist somehow vio-

lated other constitutional rights. *State v. Smith*, 705 P.2d at 1100–02.

**5.** In fact, even in his habeas corpus petition to the state court, Smith did not assert that he was entitled to a separate, adversarial psychiatrist. The district court noted that Smith first raised that issue as a new argument before it.

Fundamentally, the point is that this case is not like *Ake*, because the defendant did not even ask for an adversarial psychiatrist. It is not simply that there has been a procedural default; it is that there is no absolute right to an adversarial psychiatrist at sentencing.[6] The Montana courts recognized that when they said that this was not an *Ake* case at all. I agree. The majority does not. Thus, this dissent.

### B. *Application of the Montana Death Penalty Statute.*

The majority holds that the Montana courts fail to understand their duties in a death penalty case. In effect, it is said that when they are scrutinizing what was done they fail to gather that many circumstances taken together could possibly result in sufficient mitigation to cause a decision not to impose the death penalty.

In my opinion, that conclusion can only be reached by casting a very jaundiced eye upon what the Montana courts have done here.

The trial judge quite clearly considered all of the circumstances placed before him; he simply was not impressed that Smith had established any grounds for leniency. After hearing the evidence at the second hearing and explaining that it had "searched carefully and in vain for other factors surrounding the commission of these offenses which would or might call for leniency," the court adhered to its prior decision that Smith merited the death penalty. The majority finds it striking that the trial court's conclusions after the second hearing were the same as its conclusions at the end of the first hearing. I do not find it striking at all. While one might be impressed by the fact that Smith now decided he was substantially affected by drugs and alcohol and now thought that he could be rehabilitated, I fail to see why the trial judge was required to ignore Smith's prior testimony that he was not so affected and was not redeemable. Moreover, Smith's determination to execute two unoffending persons must have weighed somewhat heavily on the judge's mind, and nothing in the record suggests it was error for that judge to be and remain unimpressed with the other evidence Smith submitted at his second hearing.

I will not undertake to burden, bore, or ensorcell the reader by glossing what the Montana Supreme Court actually wrote when it decided this case. Suffice it to say that I can see no error in that court's approach; I commend the report of its unanimous decision to all interested persons. *State v. Smith*, 217 Mont. 461, 705 P.2d 1087 (1985).[7]

Therefore, unless Smith was, in fact, deprived of effective assistance of counsel, his death penalty was properly imposed and should stand. For that reason, I cannot concur in the majority's opinion to the contrary.

---

6. This is unlike the right to counsel to which one simply is entitled, without showing or request. *See, e.g., Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

7. Incidentally, I do not agree with the majority's suggestion that the Montana courts were required to make more extensive findings of fact, nor do I agree that the Supreme Court authorities cited for that proposition actually deal with or compel it. No particular form of written fact findings is imposed upon the state courts. That is a state procedural issue. It is not a federal constitutional imperative. Here the Montana courts were satisfied that they had complied with Montana law. It is not for us to say the contrary. *See O'Bremski v. Maass,* 905 F.2d 281, 286 (9th Cir.1990); *Middleton v. Cupp,* 768 F.2d 1083, 1086 (9th Cir.1985), *cert. denied,* 478 U.S. 1021, 106 S.Ct. 3336, 92 L.Ed.2d 741 (1986).